Lee Graff and David Check, Co-Partners d/b/a Graff & Check Real Estate, and Lester Graff, Plaintiffs-Appellees, v. Irene Whitehouse, Defendant-Appellant.

Gen. No. 50,711.

First District, First Division.

May 23, 1966.

Baraz and Sotos and Perry L. Weed, of Chicago (Perry L. Weed, of counsel), for appellant.

Cohen & Berger, of Chicago (Samuel S. Berger and Warren Krinsky, of counsel), for appellees.

MR. PRESIDING JUSTICE KLUCZYNSKI delivered the opinion of the court.

Defendant appeals from a judgment entered in favor of the plaintiffs for the sum of $4,500 and costs. Plaintiffs sued for damages sustained allegedly by reason of wrongful acts of the defendant depriving them of real estate broker's commission on the sale of certain property.

The circumstances developed in the trial are as follows. Plaintiffs have been licensed and practicing real estate brokers in Chicago for many years. Prior to 1954 Lester and Lee Graff participated as brokers in real estate transactions wherein the defendant bought and sold various properties. They also managed several properties owned by her. In the latter part of 1954 Charles Field gave Lee Graff a written 60-day exclusive sales contract regarding property he owned at 54th and Kimbark Avenue. After the expiration of the 60 days, the listing was continued on an oral basis. Field did not list this property with any other broker.

Lester Graff testified that in November 1954 his brother Lee suggested that he get in touch with defendant, Irene Whitehouse, regarding a "good piece of property." He did call her and made arrangements to have her come to the office of Graff & Check. The next day they met with David Check, Lee Graff and Mr. Whitehouse. All five of them proceeded to the Field property and inspected the outside appearance of the building. Lee Graff, with Mrs. Whitehouse, entered and examined two or three of the apartments. Mrs. Whitehouse indicated that she "liked" the building but did not have sufficient cash to purchase. Lester requested her to make an offer but she refused saying she wanted to think about it. She was then given a statement of the income, expenses and other information concerning the building taken from the files of Graff & Check.

In December 1954 a second meeting and visit was arranged. All five again visited the property and examined the exterior. Lee Graff, David Check and Mr. Whitehouse also inspected the boiler room and basement. Again, when asked to make an offer subject to the cash she had, Mrs. Whitehouse said she wanted to see the building once more. On a third visit in January 1955 she said she wished she could buy it but was short of money.

David Check gave substantially the same account of the three visits. Some time later defendant took away from them the management of her buildings. No reason was given, they did not ask for any, and, according to Check, no animosity was involved. The asking price in the exclusive sales contract for the purchase of the Field property was $92,500 or $93,000, including a commission on the basis of the rates of the Chicago Real Estate Board.

Lee Graff substantiated the testimony of David Check and Lester Graff. The exclusive contract, he said, had expired before he had contacted Mrs. Whitehouse regarding the property. He told Field more than once that he had a "very hot prospect" for the building, but never told Field the name of his prospect. He called defendant after learning that she purchased the building and inquired: "How could you do this to me?" and she hung up on him.

The owner, Charles Field, real estate broker, insurance broker and attorney, testified that he purchased the property in 1953 with Lee Graff acting as broker. In 1954 he approached Lee, said he was interested in selling the building for $92,500 and gave the exclusive 60-day sales contract. After the expiration of the 60 days, he continued the listing with Graff & Check orally. He gave them income and expense information regarding the property to be passed on to prospective purchas-

ers. In February of 1955, a man came to his home and asked him if he was interested in selling this property. Field told him he was and that the asking price was $92,500. The man then said, "Would you take $88,000 provided we gave you all cash exclusive of the first mortgage. . . . ?" Field asked the man if he represented any broker, particularly "Gold and Graff" [Graff & Check] because he would then be obligated to pay the broker's commission. The man told him he was representing a relative who would pay him if any commission was involved and Field would not be obligated in any way. Field accepted the proposal. The man took out a prepared contract containing the legal description of the property lacking only the amount of the sale price, which he then filled in with pen and ink. The parties signed, the man gave Field the earnest money check and was seen by Field no more.

A Mr. Clifford Rubin, attorney, called and made the arrangements for the closing of the deal. After a few meetings, the sale was consummated and Field executed the deed to American National Bank as trustee under Trust No. 11023. It was stipulated into the record that defendant, Mrs. Irene Whitehouse, was the beneficiary of this land trust. Field said he was at no time informed by the plaintiffs that they had a prospective customer for the property, nor did he ever meet Mrs. Whitehouse. He also said that plaintiffs never requested that he pay a commission for the sale.

Defendant, Irene Whitehouse, admitted prior dealings with Graff & Check and payment of commissions to them involving purchases by her of property through them. She denied being approached or shown by them the property involved or having conversations with plaintiffs regarding this property. She said she purchased the property through Benjamin Klein, a broker and relative "who works out of an office for Levinson."

Clifford Rubin, since deceased, was her attorney and closed the deal in her behalf for the price of $88,000. She testified she paid to Klein a commission of $2,500 and to Levinson $4,300 for obtaining a loan to finance the purchase. Klein, she said, approached her in March of 1955 concerning the purchase of the property and gave her a written statement as to income and expenditures. She was shown the property by him in March, 1955, at which time she entered a few of the apartments. She stated she was never approached by Graff & Check for a commission in connection with this sale and her first knowledge of any demands by them was upon being served with summons in the instant case. Klein and Levinson arranged with Field for the necessary secondary financing including a second and third mortgage on some other property.

The trial court found the issues for the plaintiffs and awarded them $4,500 in damages.

Defendant claims that plaintiffs failed to prove any valid and enforceable contract with the seller and that they were the procuring cause of the sale. The seller, Mr. Field, testified to the existence of the 60-day written exclusive contract with the plaintiffs. After the expiration of the 60-day period, he commissioned plaintiffs to continue their efforts to procure a buyer for $92,500 inclusive of the commission of five percent as set by the Chicago Real Estate Board.

 No particular form of agreement is required and ordinarily all that is necessary is that the broker act with the consent of his principal whether such consent is given by written instrument, orally, or by implication from the conduct of the parties. Young v. Zimmer, 56 Ill App2d 298, 206 NE2d 281 (1965), and cases cited therein. The evidence is clear, uncontradicted and convincing that Field knew plaintiffs were brokers who would request a commission if they effected a sale of

his property and he recognized this when he inquired of the person who procured his signature and consent to the sale, whether he (the man) represented any broker, particularly Graff & Check. The trial court heard the witnesses and concluded that plaintiffs did procure the sale. Evidently, the court gave no credence to the defendant's story and the evidence in the trial substantiates and does not militate against a finding that the sale was effectuated and procured through the efforts of the plaintiffs. They introduced the defendant to the property, the income and expenditures involved, and the terms of the sale. She expressed her desire to purchase but hesitated because of financing. Plaintiffs repeatedly suggested she discuss her ability to make the purchase or make some proffer subject to her cash resources. Although she declined, claiming inability to meet the terms, she ultimately purchased the property upon a basis within her means and upon terms she could have had through the plaintiffs. The transaction was not consummated on substantially different terms and the record indicates no fundamental differences between the ultimate sale negotiated and the terms of the sale proposed by the plaintiffs. It was clearly an attempt by the defendant to gain advantage by reducing the purchase price through the avoidance of a commission due the plaintiffs.

Defendant contends that plaintiffs abandoned all efforts to effectuate any sale of the property with her when they "did nothing further" after the third visit; that they, therefore, could not be the procuring cause and would not be entitled to a commission from Field. The evidence does not support such a claim. After being shown the property and advised as to the circumstances and conditions involved in the purchase thereof, defendant expressed inability to finance although interested. She intentionally did not discuss with plaintiffs her ability to buy, yet within a short time thereafter

418

entered into the contract of sale through Klein, who had all the terms prepared beforehand. He inserted the price after satisfying Field that no commission would be required of the seller. The evidence clearly established that defendant took advantage of plaintiffs' efforts and services as brokers and deliberately attempted to deprive them of their commission.

 As stated in Hackett v. Farkas, 19 Ill App 2d 309, 314, 152 NE2d 475 (1958): "Under the law in Illinois, following Lumley v. Gye, 2 E & B 216, a defendant is liable for intentionally, and without justification, inducing another person to breach his obligations with a third party whereby the third party suffers damages." The conduct of the defendant in causing the title to be transferred into a land trust of which she was the beneficiary so soon after her dealings with the plaintiffs, the circumstances of procurement of the contract for sale and its consummation, in view of her knowledge of plaintiffs' interest, can only be construed as an effort on her part to deprive plaintiffs of a commission which would otherwise be due from Field. Under the principle expressed in Hackett, defendant was answerable to the plaintiffs in damages.

We have considered defendant's other contentions and find that they do not affect the application of the principle herein quoted from Hackett as being dispositive of this appeal. The allegations, facts and circumstances adduced in the trial support the trial court's finding that defendant, by her conduct, caused damage to the plaintiffs in the amount assessed. The judgment is affirmed.

Affirmed.

MURPHY and BURMAN, JJ., concur.