PLASTICS & EQUIPMENT SALES CO., INC., Plaintiff-Appellant, *v.*
DeSOTO, INC., *et al.*, Defendants-Appellees.

First District (2nd Division)    No. 80-129

Opinion filed December 16, 1980.

Defrees & Fiske, of Chicago (Edward J. Griffin and Sarah M. Stegemoeller, of counsel), for appellant.

Arthur L. Klein and Richard K. Wray, both of Arnstein, Gluck, Weitzenfeld & Minow, of Chicago, for appellees.

Mr. JUSTICE HARTMAN delivered the opinion of the court:

On April 12, 1976, Plastics & Equipment Sales Co., Inc. (Plastics) filed a three-count complaint against Burwood Products Company (Burwood), DeSoto, Inc. (DeSoto), and Glenn Workman, general manager of DeSoto. Defendants DeSoto and Workman moved for summary judgment on April 11, 1979, supported by depositions, affidavits and exhibits to which Plastics responded, also relying on deposition testimony, affidavits and exhibits. The trial court granted summary judgment on all three counts on July 11, 1979. A motion to reconsider and vacate that determination was denied on December 4, 1979, in an order that contained appropriate Supreme Court Rule 304(a) language (Ill. Rev. Stat. 1979, ch. 110A, par. 304(a)). Plastics voluntarily dismissed its complaint against Burwood. Plastics appeals from the summary judgment orders, arguing that questions of fact were raised as to whether Plastics was entitled to a commission as a broker or a finder and whether defendants entered into a civil conspiracy to deprive Plastics of a brokerage commission. For the reasons set forth below, we affirm.

In count I of its complaint, Plastics alleged that on December 22, 1975, it entered into an oral contract with DeSoto to purchase a 1500-ton Farrell plastic molding machine, which DeSoto breached, causing $30,000 in damages to Plastics. In count II, Plastics alleged that the three defendants entered into a conspiracy to deprive Plastics of the profits it would have received had it resold the Farrell to Burwood, for which it sought $30,000 compensatory and $100,000 punitive damages. In count III, Plastics alleged that the defendants deprived it of a $30,000 commission which arose from brokerage services perfomed for DeSoto, for which it sought $30,000 in damages.

That deposition testimony which is uncontroverted reveals that DeSoto's plastics manufacturing plant in Jackson, Mississippi, which

specialized in custom molding, was intended to be closed in the fall of 1975. Initially, DeSoto expected to sell the entire plant as a going concern; however, it resorted to the sale of its machinery, personal and real property, on an individual basis when that effort failed. A list of eight of the available larger machines was compiled by DeSoto on December 5, 1975, on which each was described by make, tonnage, physical dimensions and its price. One of these machines, a 1500-ton Farrell injection molder, was listed for sale at $85,000. The list was generally distributed to various persons in the plastics industry in order to facilitate the sale of this equipment. At the bottom of the list appeared the following language: "Terms of sale: 1. As is, where is. DeSoto will disconnect. Buyer must disassemble and move. 2. Deposit 20% of purchase with balance at time of shipment."

Deposition testimony further disclosed that John Clark, president and sole shareholder of Plastics, which was in the business of buying, selling and repairing used plastic processing equipment, learned of the proposed liquidation and contacted Bob Williams, an employee of DeSoto's Des Plaines, Illinois, facility, who informed him that Glenn Workman was responsible for the sale of this equipment. Williams arranged for Clark to meet Workman at the Des Plaines plant. Clark and Workman discussed available equipment at the Jackson plant. Clark secured the list of the eight plastic molding machines.

Clark sent a letter to Donald Eggli, general manager of Burwood, a potential buyer, on December 5, 1975, describing four of the eight machines which had been included on the DeSoto list, but made no mention of DeSoto or the location of the machines. The letter quoted a $135,000 selling price for the 1500-ton Farrell. On December 15, 1975, Clark called Workman and asked if he, and perhaps another person, could accompany Workman to the Jackson plant on Wednesday, December 17, in order to view the equipment. Workman agreed. On December 17, Fredrick Kohler and several other Burwood representatives met Clark at O'Hare Field. Until that time the intended destination was undisclosed. They all flew to Jackson with Workman. Clark paid for his own and the Burwood group's transportation. In Jackson, they met plant manager Krock, who gave them a tour of the plant. Workman did not accompany them. After inspecting the 1500-ton Farrell, the Burwood group told Clark that they were interested in its purchase, but first had to discuss the matter with Eggli.

Clark thereafter told Workman that Burwood expressed an interest in purchasing the Farrell, was presently undecided, and asked for "a first refusal for them until Monday", December 22. Workman responded "Fine. There is no problem in having a first refusal for this period of time. Get back to me by noon on Monday." Clark never informed Workman of

the $135,000 price which he quoted to Burwood, nor did he believe it was a matter of Workman's concern. Clark also stated that there was never a discussion with Workman as to a commission payable to Clark by DeSoto in the event of a sale.

On the morning of December 22, 1975, after having returned to Chicago, Clark telephoned Kohler with regard to the Farrell; Kohler told him that Burwood would buy it for $115,000. Clark told Kohler he would call back shortly; then he called Workman's Des Plaines office. Workman was away from his office, so Clark left a message for him seeking to exercise the option. Later, Clark again called Kohler, who said that Burwood had since been offered the Farrell for $95,000. Clark claimed that Burwood could not, because Plastics already owned it. He and Kohler then never agreed to a price and he did not discuss the matter with him further. On December 30, Clark learned that another party, Baje Machinery Company (Baje), had purchased the Farrell from DeSoto and resold it to Burwood.

Glenn Workman testified in his deposition, among other things, that Clark visited the Jackson facility. He denied extending a right of first refusal to Clark, or receiving any message from Williams as to Clark's purported option.[1] He identified a purchase order for the 1500-ton Farrell from Baje, dated December 23, 1975, and a check for $17,000 signed by Baje representative and principal Jack Fridkin. Fridkin had been in the Jackson plant several times, was familiar with the equipment there, and had purchased various machines prior to the sale of the Farrell. When Fridkin came to the plant on December 23 and learned that the Farrell was still available, he offered to purchase it at the $85,000 list price, which Workman accepted for DeSoto.

Jack Fridkin's deposition testimony indicated that he had met with Workman on December 22 in order to pay a balance on several recently purchased machines. It was then he learned that the Farrell and several other large processing machines were still available. Thereafter he began telephoning various users of large plastic processing equipment, including Burwood, which had previously purchased a large machine from Baje. On December 23, he purchased the Farrell from DeSoto for intended resale to Burwood. His company's checks in the amounts of $17,000 as 20% deposit and, later, $68,000 as payment in full were tendered by him to DeSoto for the purchase.

In Donald Eggli's deposition, he testified that Fridkin called him on December 22, 1975, and asked if he was interested in purchasing some machines, including a 1500-ton Farrell for $95,000. Eggli then called

---

[1] DeSoto concedes the truth of Clark's version for purposes of the motion, however.

Kohler and told him to withdraw the offer to Clark. On December 23, he sent a confirmation order to Fridkin for the Farrell.

On appeal, Plastics has abandoned its primary argument presented to the motion court that the parties entered into a binding contract to purchase the Farrell when Plastics by telephone exercised the putative option that DeSoto is asserted to have granted. It now relies principally on the theory that it entered into a contract with DeSoto to perform brokerage or finder's services. Conceding that no express brokerage or finder's contract terms were agreed to, Plastics asserts that such an agreement arose by implication because, during the course of the transaction, Workman knew that Plastics was an industrial equipment broker and that Burwood was to be the ultimate purchaser of the Farrell. When Clark initiated the transaction with Workman, however, it was clear that Plastics, through Clark, made purchases on its own account for independent sales to third parties. For example, Clark had earlier offered to purchase a granulator from DeSoto outright; no offer to serve in a brokerage capacity was then extended. In the transaction involving the Farrell machine, Plastics manifested no intention to sell the Farrell for a commission. Although Workman was apprised of Plastics' plan to resell it to Burwood, no discussion of any commission for Plastics from DeSoto ever took place. Throughout this transaction Clark never discussed any amount or the requirement of a commission in the event Plastics located a buyer. DeSoto was never made aware of the price Clark had quoted to Burwood; in fact, Clark stated that his selling price was of no concern to DeSoto. Significantly, Plastics admits that it advised potential equipment buyers of prices higher than listed by DeSoto so it could secure a commission for itself on any sale. Further, at no time was there a contemplation that Plastics would share in any part of the $85,000 should that amount have been the sales price. It is nowhere claimed that DeSoto would have received any more than its listed $85,000 price for the machine if it was sold for more than that amount by Plastics.

■■■ A broker has been defined as an agent who bargains or carries on negotiations on behalf of his principal as an intermediary between the latter and third persons in transacting business relative to, *inter alia*, the purchase or sale of any form of property. (*City of Chicago v. Barnett* (1949), 404 Ill. 136, 88 N.E.2d 477.) No particular words are necessary to engage the services of a broker; rather, the essential requirement is that a broker act in that capacity with the consent of the principal. Such consent can be manifested either expressly or by implication from the conduct of the parties. (*Cole v. Brundage* (1976), 36 Ill. App. 3d 782, 789-90, 344 N.E.2d 583.) Any fair reading of the depositions in the present case indicates that Plastics and DeSoto were dealing at arm's length as

prospective buyer and seller, rather than as principal and agent under a brokerage or finder's relationship. Clark never manifested an intention for Plastics to act as DeSoto's broker, and Workman similarly never manifested an intention to employ Plastics as DeSoto's broker or finder. Plastics' complaint is also devoid of any such allegations.

Other instances similarly demonstrate that Plastics was not acting as a broker or finder on DeSoto's account. For example, Clark was unaware that certain equipment contained on the DeSoto list had been sold prior to his tour of the Jackson plant, a fact hardly indicative of communication and cooperation normally associated with a principal-agent relationship. (See, *e.g., Dorin v. Occidental Life Insurance Co.* (1971), 132 Ill. App. 2d 387, 391, 270 N.E.2d 515.) Also, Clark's request for "a first refusal for them until Monday" underscores the arm's length transaction intended, rather than an agency relationship. Workman treated Clark as he did other potential purchasers. (*Cf. Cole v. Brundage.*) He showed Clark a price list and allowed him to view the equipment without any claimed discussion implying that Plastics was to act as DeSoto's commission broker or finder.

In order to recover a commission from a seller, a broker must have an express or implied contract with him, and in the absence of such agreement his action for a broker's commission or fee may be summarily dismissed. (*O'Leary v. Crow* (1978), 60 Ill. App. 3d 135, 376 N.E.2d 392.) The requirement of such an understanding applies notwithstanding the fact, as in this case, that the broker claims to have introduced the ultimate buyer to the property. (*O'Leary v. Crow; Lord v. Melton* (1980), 80 Ill. App. 3d 1057, 1061, 400 N.E.2d 547.) Further, more than mere knowledge that one is a broker is required in order to raise an implied contract between the parties particularly where, as here, the seller may also know from previous experience that the broker purchases equipment for itself as principal. The facts in *Cole v. Brundage* and *Dickerson Realtors, Inc. v. Frewert* (1974), 16 Ill. App. 3d 1060, 307 N.E.2d 445, upon which Plastics relies, are significantly different from those obtaining at bar since, in each, a broker's commission was explicitly discussed between the parties, a fact neither pleaded in Plastics' complaint nor present in the evidence presented to the motion court in this case. In *Van C. Argiris Co. v. Caine Steel Co.* (1974), 20 Ill. App. 3d 315, 314 N.E.2d 361, the seller dealt directly with the buyer notwithstanding the fact that the broker had been working with the latter throughout an extensive negotiation period, unlike the case *sub judice.*

Plastics argues further that it should have been entitled to prove at trial that it acted as a finder for DeSoto, citing *Modern Tackle Co. v. Bradley Industries, Inc.* (1973), 11 Ill. App. 3d 502, 297 N.E.2d 688, and *Diversification Consultants, Inc. v. Candy-Gram, Inc.* (1970), 130 Ill. App. 2d 1029, 264 N.E.2d 788. In *Modern Tackle Co.,* the appellate court held

that although there need be no reliance upon the finder to perform the duties of the broker in negotiating the contract, and the finder need not operate under a written agreement of employment, nevertheless, the finder must be the procuring cause of the transaction unless the contract specifies otherwise. (11 Ill. App. 3d 502, 507.) And in *Candy-Gram*, the plaintiff and defendant corporation negotiated a five percent finder's fee as compensation. In the case before us, Clark, acting for Plastics, never came to terms with Burwood, the ultimate purchaser of the Farrell machine, nor could he have been the procuring cause of DeSoto's sale of the machine to Fridkin, who had enjoyed a previous sales relationship with Burwood. Notwithstanding the fact that he may have spent more time with Burwood's representatives, the terms he offered Burwood were obviously unacceptable, and no contract between them could have been consummated as was the ultimate sale from Fridkin to Burwood at a price $20,000 less than what Clark had been demanding. Moreover, Plastics does not claim in its pleadings to have been a finder, and nothing in the evidence presented reveals that a finder's fee was ever discussed or contemplated between the parties. No analogous facts appear in *Pilson v. Roush* (1980), 82 Ill. App. 3d 187, 402 N.E.2d 906, cited by Plastics, since there, after the expiration of a written exclusive listing agreement during which the broker brought the ultimate buyer together with defendant seller, the buyer and seller consummated the sale to the exclusion of the broker who had been orally encouraged to continue her efforts to sell the property to the ultimate buyer.

■■■ Plastics also argues that it is entitled to *quantum meruit* recovery of its commission or equivalent. A *quantum meruit* recovery requires a showing that a defendant has voluntarily accepted a benefit which would be inequitable for him to retain without payment since the law implies a promise to pay reasonable compensation when valuable services are knowingly accepted. (*Elliot v. Villa Park Trust & Savings Bank* (1978), 63 Ill. App. 3d 714, 380 N.E.2d 507; *Anderson v. Gewecke* (1976), 36 Ill. App. 3d 170, 343 N.E.2d 673; *In re Estate of Pomeroy* (1974), 21 Ill. App. 3d 648, 316 N.E.2d 231.) Quasi-contractual relief is not available, however, where the benefit is conferred officiously or gratuitously, the services were rendered in order to gain a business advantage, the plaintiff did not contemplate a fee at the time the services were rendered, or the defendant could not have reasonably believed that plaintiff expected a fee. (*Bloomgarden v. Coyer* (D.C. Cir. 1973), 479 F.2d 201.) In *Bloomgarden*, as at bar, the plaintiff was acting on his own behalf to gain a business advantage and the benefit conferred on defendant, if any, was accomplished without any expectation by plaintiff or defendant that a fee was to be paid by the defendant. Plastics' *quantum meruit* theory therefore fails. *Anderson v. Gewecke*, upon which Plastics relies, involves

significantly different circumstances, since Anderson, at the special instance and request of Gewecke, first brought to the latter's attention the possibilities of purchasing and developing land in Arizona and rendered valuable services in reliance upon a promised finder's fee of $72,000, unlike the total absence of any request for Plastics' services by DeSoto and the similar want of any discussion of a commission or fees between the parties. We note in passing that, from the facts which developed below, the existence of any brokerage relationship or unjust enrichment would appear to have involved Burwood, a party which Plastics voluntarily dismissed in the trial court.

Plastics claims that because it has pleaded the existence of a civil conspiracy, the determination of that issue almost of necessity must be reversed for consideration by a jury because conspiracy is rarely susceptible of direct proof and very nearly always must be proven by substantial evidence and legitimate inferences arising therefrom, relying upon *Majewski v. Gallina* (1959), 17 Ill. 2d 92, 99-100, 160 N.E.2d 783. In count II of its complaint, Plastics alleges that Burwood, Workman and DeSoto planned and conspired to deprive Plastics of its brokerage commission, an unlawful purpose. It argues that in light of all the strange "coincidences" which led to the eventual sale of the Farrell through the services of Fridkin, rather than those of Clark, the issue of the existence of a civil conspiracy should have been presented to the jury. As we have seen, however, plaintiff's claim to a commission is without foundation in the absence of an express or an implied contract. Since there was no contract, there can be no conspiracy to induce its breach. Plastics does not claim any duty on the part of Workman or DeSoto to have dealt exclusively with Clark after noon on December 22, 1975; thereafter DeSoto had the right to deal with any prospective buyer who may have appeared on the scene. Further, it is not claimed in the complaint nor does the evidence reveal that DeSoto or Workman had an exclusive contract with Clark in any event, having distributed its price list generally throughout the industry. We see nothing from the pleadings or the evidence which supports the theory of a combination or concerted action between DeSoto, Workman and Burwood or its employees for any purpose whatsoever. *Bau v. Sobut* (1977), 50 Ill. App. 3d 732, 738, 365 N.E.2d 724.

■■ As this court has previously recognized, summary judgment is a salutary procedure in the administration of justice but yet is a remedy which must be cautiously granted so that the respondent's right to trial is not usurped in the presence of evidentiary conflicting facts and inferences. The function of this procedure is to determine the existence or absence of triable issues of fact, and the moving party must affirmatively show that his right thereto is clear, free from doubt, and determinable

solely as a matter of law. If any material fact or facts upon which reasonable persons may disagree are identified, or inferences may be fairly drawn from those facts leading to differing conclusions, the trial court must deny the motion and direct that the resolution of those facts and inferences be made at trial. (*Diomar v. Landmark Associates* (1980), 81 Ill. App. 3d 1135, 1138-39, 401 N.E.2d 1287; *Nolan v. Johns-Manville Asbestos & Magnesia Materials Co.* (1979), 74 Ill. App. 3d 778, 794, 392 N.E.2d 1352; *Littrell v. The Coats Co.* (1978), 62 Ill. App. 3d 516, 519-20, 379 N.E.2d 293.) As has been revealed from the foregoing anaylsis of the pleadings, depositions, exhibits and affidavits, no genuine material issue of triable fact has been shown to support Plastics' claim for a broker's commission or finder's fee, right to *quantum meruit* compensation or damages emanating from a civil conspiracy. The trial court properly entered summary judgment in favor of Workman and DeSoto and against Plastics under these circumstances and must be affirmed.

Affirmed.

STAMOS and DOWNING, JJ., concur.