ALLAN BACHEWICZ *et al.*, Plaintiffs-Appellees and Cross-Appellants, *v.* AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO, Trustee, *et al.*, Defendants—(5601 North Sheridan Associates, Defendant-Appellant; The Statesman Limited Partnership, Defendant-Appellant and Cross-Appellee)—NORMAN W. FISHMAN, Plaintiff-Appellee, *v.* WILLIAM WILKOW *et al.*, Defendants (5601 North Sheridan Associates *et al.*, Defendants-Appellants).

First District (4th Division)   No. 83—265

Opinion filed June 28, 1984.—Rehearing denied August 9, 1984.

JIGANTI, J., dissenting.

Louis M. Friedman and Richard R. Rochester, both of Friedman & Rochester, Ltd., of Chicago, for appellant 5601 North Sheridan Associates.

John J. O'Toole and Anthony J. Pauletto, both of Chicago, for appellant The Statesman Limited Partnership.

Alan O. Amos, of Collins & Amos, of Chicago, for appellee Norman W. Fishman.

Frederic J. Artwick and Prentice H. Marshall, Jr., both of Sidley & Aus-

tin, of Chicago, for other appellees.

PRESIDING JUSTICE LINN delivered the opinion of the court:

Defendant, The Statesman Limited Partnership (Statesman), appeals from the judgment of the circuit court of Cook County awarding plaintiffs, B&B Investment Company and its individual partners (B&B), damages for breach of a contract to convey real estate. Both Statesman and its codefendant, 5601 North Sheridan Associates (Associates), appeal from that portion of the judgment awarding plaintiff, Norman Fishman, a real estate brokerage commission. B&B also cross-appeals respecting the amount of damages awarded to it for breach of contract.

We affirm in part and reverse in part.

FACTS

The pertinent facts presented at trial were largely undisputed:

Statesman and Associates were both formed as limited partnerships in 1972 for the specific purpose of acquiring a 90-unit apartment building located at 5601 North Sheridan Road in Chicago, Illinois. Since 1973, Statesman and Associates have each owned 50% of the beneficial ownership in the property. Legal title was held by American National Bank and Trust Company, with each limited partnership holding the power of direction only as to its own 50% interest. The conditions for either the sale of a co-owner's individual one-half interest or the sale of the entire building were set forth in paragraph 9 of a joint-venture agreement entered into by the parties in 1972.[1] That provision stated:

> "9. Both parties shall be free to transfer interests in their respective partnerships as provided in their respective partnership agreements, but in the event that either party shall desire to sell its entire partnership interest, the respective party, as the case may be, shall give the other party thirty (30) days' prior written notice of the price, terms and conditions on which it proposes to dispose of its interest and the other party shall have the right by written notice to agree to purchase upon such price, terms and conditions. In the event

---

[1]Two virtually identical agreements were introduced at trial. One agreement correctly recited that the American National Bank held legal title as trustee, while the other agreement stated that the Exchange National Bank was trustee. Although both documents were signed by Statesman, neither was executed by Associates.

that said other party declines to purchase as aforesaid, the selling party may thereafter dispose of its interest to a third party upon the terms and conditions offered, or less favorable terms to such third party. In the event the selling party desires to dispose of its interest on more favorable terms to any third party, it shall again give the other party thirty (30) days' prior written notice and the other party shall have the right to purchase as aforesaid. In the event an offer is received for the purchase of the entire apartment building, and the parties cannot agree whether to accept said offer, the party who desires to accept said offer shall so advise the other party in writing. Thereafter, said other party shall have thirty (30) days within which to either consent to the sale as proposed by such third party or may, within said thirty (30) day period, elect in writing to purchase the interest of the party desiring to sell for an amount equal to the proportionate share of the offer which would have been received by the party desiring to sell its interest in the apartment building. Failure to make an election within the thirty (30) day period shall be deemed to be a consent to such proposed sale, and the parties shall thereafter proceed to consummate such sale, and both parties agree to execute all necessary documents to complete such sale."

During the period of joint ownership, Statesman's general partners were Milton Schraiber and David Ziegler. Associates' general partners were William Wilkow (William), his father, Mendel, and uncle, Joseph. Schraiber and Ziegler dealt exclusively with William regarding joint venture matters, since he predominantly conducted Associates' affairs.

At various times, offers were received to purchase the property, about which William or Schraiber would inform the other and discuss the terms. In February 1977, Norman Fishman, a real estate broker who had recently sold an unrelated property for the Wilkows, arranged for Allan Bachewicz of B&B to inspect the Sheridan Road property. At that time, an agreement had not been reached as to Fishman's broker's commission.

After his inspection, Bachewicz had several meetings with William on behalf of Associates and with either Schraiber or Ziegler on behalf of Statesman regarding the purchase of the property. These discussions, occurring between February and May of 1977, resulted in B&B, submitting several offers to purchase the entire property. The basic terms of each offer provided for deferred payment of a

portion of the purchase price and assumption of an existing mortgage. Each offer was discussed by Statesman and Associates, but none was acceptable to both. During this time, B&B had not been shown nor advised of the 1972 joint venture agreement.

On May 25, 1977, William sent a memo to Bachewicz, Ziegler, Schraiber, Fishman and Chicago Service Realty, another broker, outlining the prior negotiations, finding the most recent B&B offer unacceptable to Associates, and suggesting a meeting· of all parties involved to determine whether "[w]e have a meeting of the minds as evidenced by a memo agreement signed by all the parties with sufficient details so as to permit the attorneys to draft proper documents." For reasons which are unclear in the record, such a meeting did not occur.

Some time after the memo was sent, William Wilkow and Richard Marmor, an attorney employed in Williams's law offices, met with Fishman and allowed him to review the joint venture agreement which incorrectly named Exchange National Bank as trustee of the property. After reading the agreement, Fishman showed them paragraph 9, about which William had forgotten. About this time, during another meeting between Fishman and Marmor, Fishman was told he would receive a commission if a sale occurred. Fishman never had any discussions with Schraiber or Ziegler about Statesman's paying a commission.

In the latter part of June 1977, William left the country for several months. In early July 1977, while William was away, B&B submitted a new written offer to Associates; the offer consisted of a two-page printed form "Real Estate Sale Contract" and a seven-page typewritten rider. Although the offer named both Associates and Statesman as sellers, the offer was delivered only to the Associates group. The offer, dated June 29, 1977, provided for a purchase price of $1,839,233.39, and that a broker's commission of $95,000 would be paid in equal portions to Fishman, Chicago Service Realty and Joseph Bachewicz. The provision respecting the commission was in accordance with an agreement reached between Fishman and Marmor.

On July 6, 1977, Mendel Wilkow, as a general partner of Associates, sent a letter to B&B that stated:

"Gentlemen:

The undersigned as 50% beneficial owner of the above property herewith accepts your offer to purchase the above property dated June 29, 1977, a copy of which is attached hereto as Exhibit A (the 'Offer'), subject to a condition precedent:

the acceptance of the Offer by The Statesman, an Illinois Limited Partnership, being the remaining 50% beneficial owner of the above property, which acceptance may be express or implied and within the time therefor allowed, pursuant to paragraph 9 of that certain Agreement between the undersigned and The Statesman, dated in 1972, a copy of which is attached hereto as Exhibit B.

Our acceptance shall be deemed effective coincident with time of acceptance by The Statesman as aforesaid."

Neither Mendel nor anyone else signed the actual offer, and William did not see the B&B offer until after it had been submitted to Associates and Mendel's letter was sent.

On July 8, 1977, Ziegler received a letter from Marmor advising him of the latest B&B offer:

"Dear David:

Enclosed please find a photocopy of an offer to purchase the above property received today by us from Mr. Allan Bachewicz providing for an all-cash deal.

Please be advised that this offer is acceptable to us and has been accepted by us as to our 50% interest. I am herewith officially tendering this offer to you for your acceptance pursuant to paragraph 9 of the Agreement between 5601 N. Sheridan Associates and your partnership dated in 1972.

Please advise me of what action you are taking or intend to take with respect to this contract."

After learning of this letter, Schraiber telephoned Marmor and told him that he had read the letter but that the offer was signed only by Bachewicz on behalf of B&B. Schraiber said that he did not understand what had occurred, nor how either Statesman or Associates could accept his offer. After asking to speak to William Wilkow, Schraiber was informed that William would not be returning from abroad until September.

On August 8, 1977, Marmor wrote Statesman stating that it was "deemed to have consented to the sale because of the lapse of thirty-one days." Schraiber and his attorney continued their attempts to meet with William to discuss the B&B offer. On September 19, 1977, a meeting finally occurred between Schraiber, Ziegler, their attorney, William, and Marmor. After Schraiber stated that the offer was too low, William offered to sell Associates' interest to Statesman for the amount Associates would realize from a sale to B&B under its current offer. Schraiber accepted these terms subject to the ability to obtain financing. During the first week in October

1977, Bachewicz called Schraiber, who informed him that B&B did not have any valid contract to purchase the joint venture property. On October 14, 1977, within 30 days of their first meeting, Statesman wrote Associates that it would purchase its 50% interest.

PROCEEDINGS

On October 19, 1977, B&B and its individual partners brought suit for specific performance. The complaint named Statesman, Associates, and the trustee as defendants. Since Associates was willing to complete the transaction with B&B, specific performance was sought only against Statesman. The trial court granted Statesman's motion to dismiss on February 24, 1978. During the pendency of the appeal brought by plaintiffs, Associates sold its 50% interest to Statesman, who then sold the entire interest in the subject property to Amvest Corporation.

On July 26, 1979, we reversed the trial court's judgment dismissing plaintiffs' complaint. (*Bachewicz v. American National Bank & Trust Co.* (1979), 75 Ill. App. 3d 252, 393 N.E.2d 652.) Thereafter, plaintiffs filed an amended three-count complaint seeking specific performance, imposition of a constructive trust on the profits realized from Statesman's sale to Amvest, and damages for breach of contract for profits which would have been realized from B&B's intended condominium conversion of the property. The trial court granted defendants' motion to dismiss count I for specific performance, but allowed the other counts to stand. Prior to trial, Associates was dismissed as a party defendant in the suit. Fishman also brought suit against Statesman, Associates and Wilkow for a broker's commission.

The two suits were consolidated for trial, and on January 20, 1983, the trial court entered its "Findings of Fact, Memorandum of Law and Order," finding that the "contract at issue here which was negotiated with plaintiff was negotiated and agreed to *on behalf of* both parties to the joint venture. Plaintiff had a right to rely upon that contract and has an action in damages for its breach." Accordingly, judgment was entered against Statesman in the amount of $599,767, which was found to be the difference between the contract price and the fair market value of the property, as well as certain incidental damages. In addition, judgment was entered against Statesman and Associates in favor of Fishman for a brokerage commission in the amount of $95,000. This appeal followed.

OPINION

# I

The threshold issue to be determined on appeal, upon which all other issues are predicated, is whether a valid contract was formed between the Statesman/Associates joint venture and B&B. In support of its position denying the formation of a valid contract, Statesman presents two arguments. First, Statesman asserts that it never intended the relationship created by agreement between itself and Associates to authorize a single joint venturer to enter into binding contracts with third parties. Second, Statesman argues that even if authority existed generally to enter into contracts with third parties, no valid contract was formed with B&B because Associates' improper acts failed to trigger Paragraph 9 of the joint-venture agreement, a condition precedent to acceptance of the B&B offer. We find each of these arguments to be without merit.

■ In addressing Statesman's first contention, we note the undisputed fact that Statesman and Associates, each formed as a limited partnership, entered into a joint agreement in 1972 for the single purpose of acquiring the 5601 North Sheridan Road property. A joint venture is the association of two or more persons to carry out a single enterprise for profit. (*Ruskin v. Rodgers* (1979), 79 Ill. App. 3d 941, 399 N.E.2d 623.) The relationship may be created by a specific contract that need show only that the parties intended to embark on a joint venture. (*Burtell v. First Charter Service Corp.* (1980), 83 Ill. App. 3d 525, 404 N.E.2d 455.) The agreement entered into by Statesman and Associates in 1972 for the ownership and management of the subject property, and referred to by Statesman in its brief as "the 1972 Joint Venture Agreement," created a joint venture. (*Bachewicz v. American National Bank & Trust Co.* (1979), 75 Ill. App. 3d 252, 393 N.E.2d 652; *Ruskin v. Rodgers* (1979), 79 Ill. App. 3d 941, 399 N.E.2d 623.) When a joint venture is found to exist, partnership principles govern. *Sharps v. Stein* (1980), 90 Ill. App. 3d 435, 413 N.E.2d 75.

A joint venture is subject to the Uniform Partnership Act (UPA). (*Mobil Oil Corp. v. Hurwitz* (1978), 63 Ill. App. 3d 430, 380 N.E.2d 49.) The law pertaining to the authority of a partner to bind the partnership is set forth in section 9(1) of the UPA (Ill. Rev. Stat. 1983, ch. 106½, par. 9(1)), and reads as follows:

> "Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for appar-

ently carrying on in the usual way the business of the partnership of which he is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority."

It is undisputed that Mendel Wilkow was a general partner of Associates. As a general partner, he was an agent *of the partnership* composed of Associates and Statesman, and thus his act "for apparently carrying on in the usual way the business of the partnership" bound the partnership, unless Associates had in fact no authority to accept an offer for the purchase of the entire apartment building. The issue, then, is twofold. We must first determine whether Mendel's acceptance of the B&B offer was an act "for apparently carrying on in the usual way the business of the partnership" (Ill. Rev. Stat. 1983, ch. 106½, par. 9(1)); second, we must determine if Associates had in fact no authority to accept the B&B offer.

This court, in the case of *Inland Real Estate Corp. v. Christoph* (1981), 107 Ill. App. 3d 183, 437 N.E.2d 658, defined the pivotal language from section 9(1) of the UPA, an act "for apparently carrying on in the usual way the business of the partnership," as an act "in furtherance of the partnership business." Thus, one partner has the authority to bind the partnership by a contract on a subject matter which is in furtherance of the partnership business. *Gardenhire v. Ray* (1939), 302 Ill. App. 268, 23 N.E.2d 927.

The "partnership business" in the instant case was the initial purchase and ultimate sale for profit of the subject apartment building. Accepting an offer by a third party to purchase the property would certainly appear essential to further this goal. That the parties contemplated such offers, as well as one partner's acceptance of such offers for the purchase of either his own interest in the property or of the entire property is evidenced by paragraph 9 of the joint-venture agreement as well as by the continuing negotiations with B&B. We must therefore conclude that (1) because Mendel Wilkow was a partner in the joint venture and (2) because his acceptance of the B&B offer was in furtherance of the partnership business, Associates had the authority to bind Statesman to the sales contract with B&B.

Statesman argues, in the alternative, that even if Associates did have the authority to bind Statesman to a contract for the sale of the entire premises, because Associates failed to satisfy the condi-

tions precedent set forth in paragraph 9 of the joint-venture agreement, no valid contract with B&B was formed. We do not agree.

In the present case, Statesman must show that the parties' intended condition precedent to contract formation was not fulfilled. (*Inland Real Estate Corp. v. Christoph* (1981), 107 Ill. App. 3d 183, 437 N.E.2d 658.) We must therefore construe the joint-venture agreement to determine the intention of the parties in drafting paragraph 9 in order that we might effectuate that intention. (*Estate of Savage* (1979), 73 Ill. App. 3d 656, 392 N.E.2d 263.) An instrument is to be considered in its entirety, together with its general scope and purpose, to determine and give effect to the real intention of the parties. (*In re Estate of Klinker* (1979), 80 Ill. App. 3d 28, 399 N.E.2d 299.) The intent of the parties is not to be determined by reference to particular words or isolated phrases, but by viewing each part in light of others. (*Arthur Rubloff & Co. v. Comco Corp.* (1978), 63 Ill. App. 3d 362, 380 N.E.2d 15.) The meaning of words may be enlarged or restricted according to the true intention of the parties, as made manifest by the various provisions of the contract as a whole. *Bull v. City of Quincy* (1895), 155 Ill. 566, 40 N.E. 1035, *rev'g Bull v. City of Quincy* (1893), 52 Ill. App. 186.

■ Applying these principles of contract construction to paragraph 9 of the 1972 joint-venture agreement, we find that Associates did satisfy the conditions precedent to contract formation. The intention of the parties in drafting paragraph 9 was to insure the furtherance of the partnership business, the sale for profit of the apartment building, by providing a means by which one party could resolve a deadlock on whether to accept a purchase offer by selling out to the other party or by consenting to a valid sale of the entire joint-venture property on behalf of the joint venture. (*Bachewicz v. American National Bank & Trust Co.* (1979), 75 Ill. App. 3d 252, 393 N.E.2d 652.) Based on prior negotiations between B&B and the joint venture, running from February 1977 through May 1977, it was reasonable for Associates to believe that Statesman would not agree to accept B&B's July 6, 1977, offer. Accordingly, Associates assumed disagreement by Statesman and, operating upon this assumption, correctly carried out the provisions of paragraph 9. Associates' assumption of disagreement, rather than denying Statesman the protection of the deadlock provision, triggered it. Moreover, the clear intent of paragraph 9 is to limit the power of acceptance of a joint-venture partner who wishes to accept an offer by making acceptance conditional on the election of the other partner. Thus, defendant's argument that Associates did not offer to sell its inter-

est to Statesman prior to accepting B&B's offer is erroneous. Under the provisions of paragraph 9, there could be no acceptance prior to notifying the other partner of his right to buy out the interest of the party desiring to sell. It was only after the 30-day election period had passed that Associates' conditional acceptance of B&B's offer became an actual acceptance so as to form a binding contract. We therefore conclude that Associates satisfied the conditions precedent set forth in paragraph 9 and that upon Statesman's failure to make an election within 30 days, the conditional acceptance became final and a valid contract was formed.

## II

Having affirmed the existence of a valid contract between the joint-venture partnership and B&B, we turn to the issue of damages for breach of that contract. The trial court assessed general damages against Statesman, using as a measure of damages the difference between the B&B contract sale price and the resale price to Amvest. Statesman urges that this was an improper measure of damages.

The well-established rule in Illinois is that the measure of damages for breach of a land sale contract is the increased value, *if any*, of the land at the time of the breach over the contract price. (*Dady v. Condit* (1900), 188 Ill. 234, 58 N.E. 900; *Spangler v. Holthusen* (1978), 61 Ill. App. 3d 74, 378 N.E.2d 304.) Within the context of this rule, the "time of the breach" is the date upon which the conveyance was to be made. (*Steward v. Yoder* (1980), 86 Ill. App. 3d 223, 408 N.E.2d 55, citing *Plummer v. Ridgon* (1875), 78 Ill. 222.) This rule applies with equal force to cases, such as the instant case, where there has been anticipatory breach in which prior to the time of performance one of the parties, here Statesman, manifests its unequivocal intent not to perform. *Farwell Construction Co. v. Ticktin* (1980), 84 Ill. App. 3d 791, 405 N.E.2d 1051.

Applying these principles to the instant facts, the breach here occurred, as the trial court found, on December 16, 1977, the date on which the B&B sale was to have closed. Thus, the proper measure of damages is the difference between the fair market value of the subject property on December 16, 1977, and the contract price.

The real issue here, then, is whether the trial court erred in concluding that fair market value was properly based on the resale price to Amvest in December 1978, approximately one year after the breach. After examining the concept of fair market value and its

role in the general theory of damages, we are convinced that the trial court's use of the subsequent Amvest resale was erroneous.

As noted previously, the general rule in Illinois is that plaintiff's damages are the difference between the contract price and the market value on the date of the breach. (*Kemp v. Gannett* (1977), 50 Ill. App. 3d 429, 365 N.E.2d 1112.) "Market value" is the sum for which the land could be sold when the owner is not obliged to sell, and there are purchasers willing to buy. *Dady v. Condit* (1900), 188 Ill. 234, 58 N.E. 900.

> " 'Fair market value' of land is not the theoretical price a particular purchaser might be willing to pay but rather the present actual value of the land with all its adaptations to general and special uses, and not its prospective, speculative or possible value, based on future expenditures and improvements." (*Fruit Growers Express Co. v. City of Alexandria* (1976), 216 Va. 602, 221 S.E.2d 157.)

The purchase price for land set in the course of an arm's length transaction, if not proved to be forced or fraudulent, is evidence of the highest rank to determine the true value of property. (*Deutschmann v. Tramposch* (1978), 64 App. Div. 2d 644, 407 N.Y.S.2d 70.) Resale price, if within a reasonable time and at the highest price obtainable after breach, is some evidence of market value on the day of the breach. (*Kemp v. Gannett* (1977), 50 Ill. App. 3d 429, 365 N.E.2d 1112.) It is this resale price, rather than the original purchase price, that the trial court found conclusive of fair market value.

It is not our task here to reweigh the evidence presented to the trial court. Thus, in order for us to hold that the trial court applied an erroneous measure of damages, we cannot find that the original contract price and the identical contract price in the Statesman/Associates transaction were better evidence of fair market value on the date of the breach; we must find that the resale to Amvest was inadequate evidence to establish fair market value on the date of the breach. For the following reasons, we so find.

The date of the breach was December 1977. The original contract and the Statesman/Associates transaction took place in August and September 1977, respectively, both within a few months of the breach. The subsequent resale to Amvest occurred in December 1978. This time differential, while not conclusive, is a definite factor in determining whether the Amvest sale reasonably reflects fair market value on the date of the breach, one year earlier.

The evidence adduced at trial showed that the B&B contract

was an arm's length transaction, negotiated over a six- to eight-month period. Moreover, there is no evidence in the record that at any point during this protracted negotiation period, Statesman demanded that B&B increase the amount of its offer. The evidence shows rather that B&B's revised offers reflected Statesman's dissatisfaction with the financing, not with the purchase price. The evidence also shows that in February 1977, Statesman found the purchase price acceptable and that it was not until September 1977, after B&B had a binding contract, that Statesman began to complain that the purchase price was too low. Statesman in fact turned around and agreed to purchase Associates' share of the property for the exact price B&B would have paid for that share. Statesman presented no evidence of fraud or overreaching in connection with the B&B contract accepted by Associates and, through lack of affirmative prevention, by Statesman. Additionally, Statesman owed a fiduciary duty to its partner, Associates, to deal in good faith, and presumably its offer to Associates, identical in price to the B&B offer, was reflective of this duty and not of any hidden or superior knowledge of market value.

The purpose of damages is to put the nonbreaching party into the position he would have been in had the contract been performed (*Kemp v. Gannett* (1977), 50 Ill. App. 3d 429, 365 N.E.2d 1112), but not in a better position. (*Litwin v. Timbercrest Estates, Inc.* (1976), 37 Ill. App. 3d 956, 347 N.E.2d 378.) The compensation awarded in a breach of contract action should not provide plaintiff with a windfall recovery. (*Kalal v. Goldblatt Brothers, Inc.* (1977), 53 Ill. App. 3d 109, 368 N.E.2d 671.) Based on these well-established principles, the trial court's reliance on *Kemp v. Gannett* (1977), 50 Ill. App. 3d 429, 365 N.E.2d 1112) to measure damages in the instant case was misplaced. In *Kemp,* plaintiff, in reliance on defendant's promise, agreed to relist his home with defendant realtor on the condition that defendant would buy it himself if it was not sold at the end of 90 days. The realtor failed to buy the house, and plaintiff was not able to sell the house for almost a year. When plaintiff finally succeeded in selling his house, it was for less than the contract price. In order to put the seller into the same position he would have been in had the original contract been performed,, the trial court awarded him the difference between the original contract price and the lower resale price. (50 Ill. App. 3d 429, 365 N.E.2d 1112.) See also *Gryb v. Benson* (1980), 84 Ill. App. 3d 710, 406 N.E.2d 124 (resale price used as fair market value where lower than original contract price).

Here, the resale price is close to a half million dollars greater

than the original contract price. Whereas in *Kemp*, if the court had not used the resale price, the nonbreaching party would not be in as good a position as he would have been in had the contract been performed, here, the court's use of the resale price puts B&B in a better position, allowing it to realize a windfall profit for which it had never bargained. Moreover, there is no evidence in the record that B&B could have turned around *on the date of the breach*, the only relevant date in question, and sold the subject property for one-half million more than for what B&B itself was willing to pay.

In *Dady v. Condit* (1900), 188 Ill. 234, 58 N.E. 900, the seminal case in Illinois on damages for breach of a land sale contract, the court acknowledged that the fair market value need not be greater than the contract price and that absent sufficient evidence, general damages may not be awarded. Where the property is of no greater value on the day of the breach than the contract price, or, alternatively, where there is no evidence of the value of the land on the date of the breach except the agreed price, which has not been paid, plaintiff can recover nominal damages only.

The burden is on plaintiff to prove fair market value on the date of the breach. Because plaintiff in the instant case failed to carry that burden, we necessarily find that the trial court's use of the resale price as a basis for measuring damages was erroneous.

### III

■ Plaintiff, in his cross-appeal, suggests the alternative theory of constructive trust as a valid basis upon which this court might affirm the trial court's damage award. B&B seeks the imposition of a constructive trust over the profits Statesman realized from the resale of the subject property to Amvest in December 1978. Statesman argues that under Illinois law, a constructive trust may not be imposed unless the plaintiff alleges and proves the abuse of a confidential relationship or fraud. Neither has been proved here.

> "A constructive trust is one raised by operation of law as distinguished from a trust created by express agreement *** It is imposed by a court *** to prevent a person from holding for his own benefit an advantage which he has gained by reason of a fiduciary relationship or by fraud. Such a trust arises only when fraud is proved or when advantage is taken of a fiduciary relationship *** [Citations.] The proof of such fiduciary relationship must be so clear and convincing and so strong, unequivocal and unmistaking as to lead to but one conclusion." (*Perry v. Wyeth* (1962), 25 Ill. 2d 250, 253, 184

N.E.2d 861.)

Even though a vendor under a contract for the sale of property is regarded as a trustee of the title for the benefit of the vendee, and the latter as trustee of the purchase money, the trust relationship is not fiduciary. *Englestein v. Mintz* (1931), 345 Ill. 48, 177 N.E. 746.

In the instant case, plaintiff alleges neither fraud nor a fiduciary relationship. What plaintiff does allege is breach of contract. However, mere breach of contract does not give rise to a constructive trust. (*Evans v. Berko* (1951), 408 Ill. 438, 97 N.E.2d 316.) For these reasons, we reverse the trial court's award of general damages and, correspondingly, the award of prejudgment interest thereon.

## IV

In addition to the award of general damages to B&B, the trial court awarded incidental damages in an amount totaling $32,296.80. On appeal, Statesman suggests that these damages should be limited only to those incurred prior to the first week in October 1977, the time of the breach, and that all other consequential damages should be disallowed because of plaintiff's failure to mitigate. While this argument of mitigation, raised for the first time on appeal, is not without merit, the law is clear that failure to mitigate damages is an affirmative defense that must be pleaded and proved by defendants. (*Rozny v. Marnul* (1969), 43 Ill. 2d 54, 250 N.E.2d 656.) The record before us is devoid of any pleadings raising the defense of failure to mitigate damages. For this reason, we find that defendants have waived the argument on appeal, and the trial court's award of incidental damages, as supported by the proof in the record, is not against the manifest weight of the evidence.

## V

The final issue pertaining to plaintiff's damages is that raised in B&B's cross-appeal regarding lost profits. B&B claims that it is entitled to recover the profits it would have made had Statesman not breached the real estate contract and had B&B converted the property and sold it as condominiums. In denying this claim, the trial court, in its memorandum of law, noted the following:

"In order to allow recovery under this theory [lost profits], the court must determine that the loss has been proven with a reasonable degree of certainty, that the defendant's wrongful act resulted in the loss, and that the profits were reasonably within the contemplation of the defendant at the time he

entered into the contract. *Student Transit Corp. v. Board of Education of the City of Chicago* 76 Ill. App. 3d 366, 369, 395 N.E.2d 69, 71 (1979)."

The lower court concluded that because no evidence was presented which established actual knowledge by defendant of the legal and financial steps taken by plaintiff toward the planned conversion, these criteria were not satisfied, and plaintiff's lost profits claim must fail. Plaintiff takes issue with this reasoning, arguing that the fact that Statesman had been advised of B&B's intention to convert the property to condominiums coupled with defendant's general knowledge of real estate development was sufficient to support a lost profits claim. We do not agree.

In *Spangler v. Holthusen* (1978), 61 Ill. App. 3d 74, 378 N.E.2d 304, a case relied upon by the trial court and one which plaintiff attempts to distinguish, this court, citing *Globe Refining Co. v. Landa Cotton Oil Co.* (1903), 190 U.S. 540, 544-45, 47 L. Ed. 1171, 1173-74, 23 S. Ct. 754, 755-56, stated that where lost profits are sought as arising from a breach of contract, "[I]t may be said with safety that mere notice to a seller of some interest or probable action of the buyer is not enough necessarily and as a matter of law to charge the seller with special damage on that account if he fails to deliver the goods." In *Spangler*, the court held that the breaching plaintiffs could not be held liable for the lost profits resulting from a collateral contract defendant had with a third party because it arose after plaintiffs entered into their transaction with defendant, and they were never informed of the specific resale contract defendant had pending. The general knowledge that the purchaser developed land and might sell off some part of it was insufficient to charge the seller with the specific knowledge necessary to sustain a claim for lost profits. *Spangler v. Holthusen* (1978), 61 Ill. App. 3d 74, 82.

In the instant case, the only proof B&B offered to show Statesman's knowledge was the fact that Statesman had been informed of B&B's general planned action to convert the subject property into condominiums and to sell the condominiums. Unlike *Spangler*, in which the court denied lost profits, here there was no specific collateral resale contract into which defendant had entered at the time the present suit was filed. Also unlike *Spangler*, where plaintiffs needed only to perform the breached contract to enable defendant to profit from his collateral contract, here, plaintiff needed not only to complete the purchase of the subject property from defendant in order to resell, but B&B also needed to complete successfully the conversion of the existing building into condomin-

iums and then to resell each unit. Thus, plaintiff's argument that an appraisal by an independent real estate appraising firm "showed the value of the property as of September 1, 1977, *if converted to condominiums,* to be $3,853,500" misses the point: the property, as of September 1, 1977, was neither converted into condominiums nor under a contract for sale. The lost profits in the instant case were contingent on both the conversion and the ultimate sale of the units. Because such contingency renders the claim of lost profits speculative, we affirm the trial court's denial of recovery.

## VI

■ The final issue in the instant appeal is whether Statesman and Associates are liable to Norman Fishman for a real estate brokerage commission on the sale of the subject property to B&B. Fishman claims recovery on a *quantum meruit* theory based upon quasi-contract. Associates argues that, in the event judgment is entered in favor of B&B, it is liable to Fishman only for his one-third of the $95,000 brokerage commission, which, according to written contract, was to be split equally between three brokers. Statesman denies all liability to Fishman, asserting that it never hired him as its broker. The trial court, finding that Fishman had established a *prima facie* case of having earned his brokerage commission, entered judgment against the joint venture in favor of Fishman for the entire $95,000 amount. While we agree with the trial court's finding that Fishman is entitled to a brokerage fee, we do not agree that he may recover the entire $95,000 based on the theory of quasi-contract.

The general rule in Illinois is that no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter that would give rise to the quasi-contract. (*Industrial Lift Truck Service Corp. v. Mitsubishi International Corp.* (1982), 104 Ill. App. 3d 357, 432 N.E.2d 999.) The existence of an express contract covering all the terms and conditions of the agreement between the parties precludes a search for or an inquiry into the existence of an implied contract. (*Bartolo v. Skaggs Construction Co., Inc.* (1975), 25 Ill. App. 3d 117, 323 N.E. 123.) In the instant case, an express written contract exists.

On June 29, 1977, B&B submitted a contract for purchase of the subject property to Associates for its acceptance. Paragraph 6 of the contract provided that the "Seller agrees to pay a broker's commission 1/3 to Norman W. Fishman, 1/3 to Chicago Service Realty and 1/3 to Joseph Bachewicz in the amount of $95,000." This contract was conditionally accepted by Associates and, upon Statesman's failure

to make an election within 30 days, ultimately accepted by the joint venture. When the joint venture's acceptance became final, a contract was formed. Statesman then became liable for the provisions in the B&B contract, one of which was to pay to Fishman and the other brokers a brokerage fee.

Even if the B&B contract had not been formed, Statesman would still be liable to Fishman for a brokerage commission by virtue of Statesman's conduct, which created a contract implied in fact (*Van C. Argiris Co. v. Caine Steel Co.* (1974), 20 Ill. App. 3d 315, 314 N.E.2d 361) which clearly manifested its consent to engaging and using Fishman's services as a broker. (*Plastics & Equipment Sales Co. v. DeSoto, Inc.* (1980), 91 Ill. App. 3d 1011, 415 N.E.2d 492.) Once Statesman manifested consent, Fishman needed only to produce a buyer ready, willing, and able to purchase on the seller's terms in order to earn his commission. (*Gallina v. Dollens* (1979), 75 Ill. App. 3d 174, 394 N.E.2d 36.) The ultimate consummation of the sale was not essential to Fishman's right to collect his brokerage commission. (*Beider v. Eugene Matanky & Assoc., Inc.* (1977), 55 Ill. App. 3d 354, 371 N.E.2d 29.) Either of these contracts, whether the express written contract or the contract implied in fact, precludes a quasi-contractual claim.

Fishman, desirous to pursue his *quantum meruit* recovery of the entire commission, denies being a party to the express written contract but acknowledges that he was a party to the prior oral agreement with Associates and implied agreement with Statesman. Fishman's position, in addition to being controverted by the evidence, reveals his apparent misunderstanding of two important legal principles. First, the prior agreements with the joint-venture partners, whether oral or created by conduct, were as much contracts as the express written agreement and therefore preclude recovery under the theory of quasi-contract. A contract implied in fact is a contract, whereas a contract implied by law, a quasi-contract, is an equitable theory of recovery. The existence of the former precludes the court's allowance of the latter. Second, under the parol evidence rule, all preliminary negotiations, whether oral or written, are merged into the written contract. (*Kendall v. Kendall* (1978), 71 Ill. 2d 374, 375 N.E.2d 1280.) Where, as here, a written contract provision is clear and unambiguous as to the object and extent of the agreement, parol evidence is inadmissible to vary or contradict it. *Main Bank of Chicago v. Baker* (1981), 86 Ill. 2d 188, 427 N.E.2d 94.

Paragraph 6 of the B&B contract is a clear provision embodying the terms of the brokerage commission agreement and into which all

prior agreements and preliminary negotiations are merged. The provision binds not only Statesman and Associates but Fishman as well. Moreover, Fishman testified at trial that when Richard Marmor proposed that the $95,000 brokerage commission be split three ways, Fishman accepted because "he did not want to break the deal." Fishman therefore admitted his acceptance of the express contract provision. Accordingly, we affirm the trial court's finding that Fishman earned his brokerage commission, but we reduce the amount awarded to one third of $95,000, or $31,666.66, as per the contract.

For all of the foregoing reasons, we affirm in part and reverse in part the judgment of the trial court. Our decision is summarized as follows: we affirm (1) the finding of a valid contract between B&B and the joint venture, (2) the consequential damage awarded to B&B in the amount of $32,296.80, (3) the denial of B&B's cross appeal for lost profits and the imposition of a constructive trust, and (4) the award of a brokerage commission to Norman Fishman, reduced to the amount to $31,666.66. We reverse the award of general damages to B&B in the amount of $599,767.00 and the award of prejudgment interest thereon.

Affirmed in part, reversed in part.

ROMITI, J., concurs.

JUSTICE JIGANTI, dissenting:

In his treatise on Damages, Professor McCormick noted that "market value" is a relative term. (C. McCormick, Damages sec. 44, at 166 (1935).) The market value of standardized goods such as stocks and bonds or commodities on the major exchanges, where the prices are recorded at least day to day, can be determined with a high degree of certainty. (C. McCormick, Damages sec. 44, at 166 (1935).) However, when commodities are not standardized, " 'market value' becomes an inference as to the action of an imaginary purchaser, based upon data more or less conjectural, as to which inferences different persons sitting on the bench or in the jury box might reasonably differ within limits wider or narrower as to each kind of property mentioned." (C. McCormick, Damages sec. 44, at 166 (1935).) Illustratively, Professor McCorimck observes that one cannot appraise the market value of the Empire State Building on a given day. "The process of securing a purchaser or syndicate of purchasers for such a building is too long and too much attended with

uncertainty as to outcome for any two experts to arrive independently at similar results. The expression 'market value' in this latter instance becomes a vague ideal rather than a reasonably definite standard." C. McCormick, Damages sec. 44, at 166 (1935).

Professor McCormick's observations are particularly pertinent to the facts presented in the instant case. The trial court was charged with the responsibility of determining the fair market value of this unique property, a 20-story, 90-unit apartment building, on the date of the breach of contract in December, 1977. The trial judge was presented with two separate theories of market value. First, there was evidence that the fair market value was in excess of $1.8 million on the date of the breach. B&B submitted an offer in June 1977 for that amount, which was satisfactory to Associates but not to Statesman. A short time later, Statesman bought Associates' one-half interest for one-half of the amount offered by B&B. The second item of evidence was Statesman's actual subsequent sale of the property to a third party, Amvest, for $2,300,000 seven months after the breach. The trial court accepted the latter value as the fair market value. The majority of this court has reweighed the evidence and has found that "the resale to Amvest was inadequate evidence to establish fair market value on the date of the breach." For the following reasons, I respectfully dissent from the majority opinion.

Although the majority states that the resale to Amvest was inadequate evidence, the only support for the assertion is that the contract with B&B was in August or September of 1977, while the resale to Amvest was in December of 1978. I question the relevance of those dates. The breach occurred in December 1977. Although the Amvest deal closed in December 1978, the actual contract for sale between Amvest and Statesman was consummated in July of 1978, seven months after the date of the breach. However, the date of the sale is the majority's only direct comment upon the evidence of the subsequent sale that it finds to be "inadequate evidence." The majority's conclusion on that point is that it is a "definite factor." I agree. It is a definite factor that the trier of fact should consider, which it did. It is a sale within a reasonable time. (*Kemp v. Gannett* (1977), 50 Ill. App. 3d 429, 365 N.E.2d 1112.) The majority does not argue that it is inadmissible evidence, but only that it should be disregarded.

Although the above-cited language is the majority's only comment upon the evidence, there are a number of insinuations concerning the subsequent sale. The majority comments that the purchaser should not be put in a "better position" or receive "a windfall re-

covery." Further, the majority comments that the resale price was "closer to $½ Million greater than the original contract price." The presumption underlying these comments is that the subsequent sale indeed generated a windfall profit or a price greater than market value. That, of course, is the issue and not the answer to the problem before this court.

In considering the evidence of the subsequent sale, the majority also observes that there is no evidence that "B&B could have turned around on the date of the breach *** and sold the subject property for $½ Million more ***." The buyer, however, has no legal duty to present such evidence. Rather, he must prove the fair market value on the date of the breach. As Professor McCormick observed, fair market value is an ideal, not a definite standard, and finders of fact may differ as to what constitutes value. I fail to see why the evidence of the subsequent sale in this case is not evidence upon which the trier of fact could have based its finding.

Although the majority's opinion on this issue is based upon the inadequacy of the evidence of the subsequent sale, a few comments must be made concerning the transactions between B&B, Statesman, and Associates that the majority apparently finds most persuasive. The majority states that this was an arms-length transaction negotiated over a period of six months. I question the soundness of that line of reasoning. In a negotiating situation, an offer by a prospective purchaser is only marginal evidence of fair market value. The purchaser quite obviously is interested in obtaining a bargain and may well formulate his offer in anticipation of counteroffers by the seller or other specialized circumstances peculiar to the parties or the property. Evidence of an offer becomes more persuasive, although not conclusive, when the seller actually accepts the offer. In this case, only one of the two owners of the property, Associates, accepted the offer. Even Associates' acceptance as evidence of fair market value is questionable because William Wilkow of Associates testified he was "anxious to get out of the investment." Allen Bachewicz testified that Wilkow stated he "wasn't looking to make any more than his original investment in the property." Associates' sale in 1977 to Statesman simply allowed Associates to recoup the original investment it had made over four years earlier. Although this was an arms-length transaction, the trier of fact could consider whether factors other than market factors influenced Associates to accept the offer. The trier of fact could further consider that, although Associates' acceptance of the offer was some evidence of fair market value, Statesman not only rejected the offer but was willing

to purchase Associates' interest in the property for half of the amount of the offer. I believe that the trial judge could conclude from this evidence that the B&B offer did not reflect fair market value.

The majority's emphasis upon the B&B offer and its subsequent acceptance by Associates appears to suggest that the contract price is conclusive evidence of fair market value. With that contention I disagree. Subjective factors may prompt the acceptance of an offer at something less than market value. Further, and more importantly, even if the parties negotiate extensively and in good faith, the buyer may have actually received what he was looking for, a bargain. Similarly, the seller may also have sold the property for more than fair market value.

The majority observes that there is no evidence in the record that, during the protracted negotiations, Statesman demanded the offer to be increased. The majority further states that Statesman's dissatisfaction was with financing and not with the purchase price. The majority's evidentiary support for this statement is that Bachewicz testified that at one of the meetings, one of two people from Statesman was there. Bachewicz was uncertain which person was present. He further testified that "No one objected to the purchase price, to my recollection at those meetings." No one else testified as to the participation of Statesman in the negotiations. There is very little evidence at all as to what actually transpired during the negotiations. In fact, Statesman found the offer so unacceptable that Statesman itself was willing to purchase Associates' interest at that same price. The majority's citation of this rather sketchy testimony as persuasive evidence of fair market value eludes me.

This 20-story, 90-apartment building may not be the Empire State Building Professor McCormick discussed in his treatise. However, it is a unique piece of property not readily admitting to a precise determination of its value. The inferences that the trial court drew in determining its value were certainly within the range of permissible inferences that the trier of fact could draw. I would affirm the trial court on this issue.