DICKERSON REALTORS, INC., Plaintiff-Appellant, *v.* WILLIAM H. FREWERT *et al.,* Defendants-Appellees.

(No. 72-276;

Second District—January 23, 1974.

*Rehearing denied March 13, 1974.*

Welsh, Holmstrom, Hyzer, Jacobson & Worden, of Rockford, for appellant.

William H. Frewert, *pro se.*

Mr. JUSTICE RECHENMACHER delivered the opinion of the court:

Plaintiff, a real estate brokerage corporation, brought suit to recover a commission it claimed to have earned by procuring a purchaser for defendants' real estate based on an implied contract between the plaintiff and defendants. Following a bench trial, the circuit court of Winnebago County entered judgment for the defendants, holding there was no implied contract.

The only question presented by this appeal is whether the trial court's decision is against the manifest weight of the evidence. Plaintiff contends that the evidence established that there was an implied contract of employment between the parties.

The defendants owned a home in Rockford which they had been trying to sell, first with a listing through another broker at $44,700, and then after that listing expired in December of 1970, by themselves. On April 21, 1971, Mrs. Jan Carlson, a real estate sales woman employed by the plaintiff, telephoned defendants' home and (in Mr. Frewert's absence) secured Mrs. Frewert's permission to show the house to prospective buyers, the Coopers, at 2:00 P.M. on that day. After going through the house, the Coopers, at plaintiff's office, signed an offer to the defendants to buy their home for $42,500, subject to obtaining a $9,500 mortgage at 7% due in 15 years; closing and possession were set for June 15, 1971. Mrs. Carlson then telephoned defendants' home, told Mrs. Frewert she had an offer, and arranged to see her between 3:00 and 4:00 P.M., with Mr. Dickerson, an official of the plaintiff. During that visit, Mrs. Frewert told them that she could not reach her husband until that evening at his parents' home in the Chicago area. They arranged for Mrs. Carlson to come over again in the evening to telephone him. Mrs. Carlson did so, charging the toll call to plaintiff's phone, and read the offer of $42,500 to Mr. Frewert. During that telephone conversation Mr. Frewert told her that he would not consider less than "$40,500 net" to him. When Mrs. Carlson told him she was representing him, Mr. Frewert testified he said to her that in that case "she should consider adjusting the commission so I would net what I would indicate was my bottom dollar." Mr. Frewert further suggested that in view of the fact that his children were still in school, and since he didn't know where he was going to move, he would like the contract to provide for an additional 30 day possession, at a rental of $30 for each day, not to exceed 30 days, suggesting that this would provide an incentive and make it more appealing to the prospective buyers and help to defray the expenses of their staying in a motel and storing their furniture during such period.

Mrs. Carlson discussed with Mr. Dickerson the question of cutting the commission and was told by him it was against company policy. That evening Mrs. Carlson negotiated further with the Coopers, telling them what the defendants wanted and that the offer would have to be $43,550. She prepared such an offer, subject to the buyer obtaining a mortgage loan of $10,000 due in 10 years with 7% interest, closing and possession to be June 15, and with the proviso suggested by Mr. Frewert for a $30 a day rental for the period not exceeding 30 days from June 15,

1971. The Coopers told her their limit was $43,000 and the offer was accordingly amended, signed by the Coopers and accompanied by their $1,000 check payable to the plaintiff as an earnest money deposit.

At 10:30 P.M., April 21, Mrs. Carlson telephoned Mr. Frewert again about the second offer from the Coopers. Mrs. Carlson testified that Mr. Frewert told her "he wouldn't make any decision" and remarked that his wife was coming to Chicago the next morning to look at houses with him. Mrs. Carlson then told him she would deliver the papers to Mrs. Frewert at the bus depot in the morning so "she could take them into Chicago." Mr. Frewert testified that in that conversation Mrs. Carlson said she was aware that Mrs. Frewert was going to Chicago the next day to meet him and asked whether she could deliver the second offer to his wife; that he told her "she could do anything she liked, but as far as I was concerned the matter was at an end * * *".

The next morning, April 22, Mrs. Carlson met Mrs. Frewert at the bus depot, handed her the Coopers' second offer, the check and a completed sales agency contract for defendants' signatures, and when Mrs. Frewert told her she would be back in Rockford about 6:00 P.M., Mrs. Carlson asked that defendants call her if they made a decision during the day.

While in Chicago on April 22, the defendants made an offer on a residence in that area which was accepted. Mr. Frewert inquired of Mrs. Frewert where Cooper worked, located him, telephoned him direct in Rockford, and during that conversation agreed to sell their Rockford house to the Coopers for $41,500 cash without contingencies and with possession on June 15. The written offer was executed by the Coopers and defendants under date of April 24, 1971, and contained an agreement by defendants to indemnify the Coopers against any liability for real estate commission.

Mrs. Carlson, who did not know of that development, telephoned the Frewert home about 8:15 P.M. on the 22nd and was told by Mrs. Frewert that her husband would telephone Mrs. Carlson at her office at 9:00 P.M. Mr. Frewert did so and in that conversation told Mrs. Carlson he did not want to deal with a realtor and would deal directly with the Coopers. When Mr. Dickerson returned to the office about midnight he told Mrs. Carlson that Mr. Cooper had informed him earlier in the evening that Mr. Frewert had called Mr. Cooper personally and wanted to deal directly with him.

Thereupon, Mr. Dickerson telephoned Mr. Frewert at his parents' home. In that conversation, Mr. Frewert said in effect that his efforts to get plaintiff to cut his commission were not successful; that Mr. Frewert felt that plaintiff did not have his property listed; that since, if plaintiff

had sold it when it was listed with another broker (under the so-called Multiple Listing Service) plaintiff would only have received 60% of the commission, such an amount would be adequate for plaintiff to receive for the sale, but that now Mr. Frewert was unwilling to negiotiate any further with the plaintiff.

■■ While a contract of employment is necessary to create an agency relationship between a broker and an owner of property, no particular form is required. Ordinarily, all that is necessary is that the broker act with the consent of his principal either by written instrument, orally or by implication from the conduct of the parties. *Graff v. Whitehouse* (1966), 71 Ill.App.2d 412, 417, 219 N.E.2d 128; *Doss v. Kirk* (1956), 8 Ill.App.2d 536, 539, 132 N.E.2d 49; I.L.P. *Brokers* § 22; and *Greenwald v. Marcus* (1954), 3 Ill.App.2d 495, 499, 123 N.E.2d 139.

Defendants knew the plaintiff was a real estate broker who expected them to pay plaintiff's commission if a sale was effected. They allowed plaintiff to show the property to the Coopers. When Mrs. Carlson presented Mr. Frewert the first $42,500 offer from the Coopers and told him that she was representing Mr. Frewert (not the Coopers), he stated that he wanted "$40,500 net" for the property and suggested that plaintiff adjust the brokerage commission to accomplish that end. When Mrs. Carlson could not do this and negiotiated further that evening with the Coopers and procured from them an increased offer of $43,000, such offer would have been within $510 of the "$40,500 net" for the property which Mr. Frewert desired, after payment of the customary 7% commission. The very next day, with that written offer procured by the plaintiff in their hands, the Frewerts contracted to buy a home in the Chicago area, then communicated directly with the Coopers and agreed to sell their home to them for $41,500 and to hold them harmless from any real estate commission liability.

■■ The evidence reveals no doubt as to the fact that a contract of employment must be implied in law to have existed between plaintiff and defendants. It is conceded that plaintiff procured the Coopers who were interested in purchasing the property. Since the evidence further shows a contract of sale having been entered into between defendants and the Coopers within a day or two after plaintiff communicated the Coopers' offer, there remains no question as to the willingness or ability of the Coopers to purchase the property. Clearly, the sale resulted from the plaintiff's efforts as a real estate broker.

Moreover, the right to recover on a contract implied in law or quasi-contract is governed by the principles of equity although the action is at law, and the action is maintainable in all cases where one party has received a benefit which it would be inequitable for that party to retain.

This is based upon the principle that no person shall enrich himself at another's expense. (*Board of Highway Comm'rs v. City of Bloomington* (1911), 253 Ill. 164, 172, 97 N.E. 280; *First National Bank of Lincolnwood v. Glenn* (1971), 132 Ill.App.2d 322, 324, 270 N.E.2d 493.) The evidence clearly established that defendants took advantage of the plaintiff's efforts and services as a broker and deliberately tried to deprive it of the brokerage commission. In *Topinka v. Wicena* (1925), 236 Ill.App. 607, 612, relied upon by the defendants, the response of the owner of certain lots to a broker's letter offering his services in the sale of said lots and asking for the owner's lowest price, was that such price was "$14,000 * * * without commission." The court in holding against the broker stated that "the words '$14,000—without commission' may not be construed to mean '$14,000—net.'".

In the instant case, the defendants not only stated that the price was "$40,500 net", but when presented with the $42,500 offer, suggested that the broker cut his commission to arrive at that result. The plaintiff then procured an increased offer of $43,000 which was not far from the $40,500 net, after payment of the 7% brokerage commission. Without giving the plaintiff the opportunity to negotiate further with the Coopers, and with the last offer still in their hands, defendants dealt directly with the Coopers and sold the property to them for $41,500.

■■ The evidence shows that the customary real estate brokerage commission in Rockford is 7% of the sales price. Plaintiff asked judgment for $2,905, representing a 7% commission based on the sale by the defendants for $41,500. Defendants urge that if we hold that a contract implied in law existed between the parties, the commission be determined based on the "reasonable value" of plaintiff's services, rather than on the customary commission in the community because plaintiff knew "that defendants did not want to pay a full commission." However, the evidence shows that in their dealings with the plaintiff on the Coopers' offer, the defendants' primary objective was to obtain "$40,500 net." The $43,000 offer was close to that objective, after commission, and but for defendants' direct dealings with the Coopers that objective might have been reached.

We, therefore, hold plaintiff is entitled to recover $2,905 from the defendants and judgment is entered accordingly. Judgment is reversed and entered herein for the plaintiff in this court.

Reversed, with judgment here.

T. MORAN, P. J., and GUILD, J., concur.