BENNETT & KAHNWEILER ASSOCIATES, Plaintiff-Appellee, v. GARY P. RATNER *et al.*, Defendants-Appellants.

First District (5th Division)   No. 83—1431

Opinion filed May 17, 1985.

David C. Roston, of Altheimer & Gray, of Chicago, for appellants.

Harry Golter and Timothy G. Nickels, both of Wildman, Harrold, Allen & Dixon, of Chicago, for appellee.

PRESIDING JUSTICE MEJDA delivered the opinion of the court:

Defendants Gary P. Ratner (Ratner), Rentar Industries Realty Corporation (Rentar), and Couzens Warehouse and Distributors, Inc. (Couzens), appeal from an order granting plaintiff Bennett & Kahnweiler Associates' (B&K) motion for summary declaratory judgment against defendants collectively and against Ratner individually. The order stated that defendants had waived the termination date of the exclusive listing agreement (listing agreement or agreement) which had existed between the parties, and that defendants were therefore liable to B&K for a brokerage commission in the sum of $231,840. On appeal, defendants contend that the express terms of the agreement preclude B&K's recovery, since the lease was finalized after the agreement had terminated. In addition, defendants maintain that summary judgment was improper since the relevant facts were susceptible of more than one interpretation. We affirm.

On May 1, 1981, Ratner signed a six-month listing agreement with B&K for the sale or lease of a warehouse and 25 surrounding acres of land (the property). The property was owned by Rentar and operated by Couzens. Ratner, at this time, was president of the former entity and chairman of the board of the latter. In signing the agreement with B&K, however, Ratner did not indicate any agency relationship with either of the other defendants.

The listing agreement provided that B&K was to receive a broker's commission if the property was sold, leased, or otherwise disposed of to any prospect at any time before November 1, 1981, the termination date of the agreement. The agreement additionally stated that, in the event the property was disposed of within 180 days after the termination date, B&K would still receive a commission if the buyer or lessee was a prospect to whom the property had been submitted during the term of the agreement, provided that the prospect's name was submitted to defendants within 10 days following the termination of the agreement.

B&K failed to secure either a lease or a sale of the property dur-

ing the six-month term of the agreement. On October 28, 1981, Arnold Dratt, as vice-president and general counsel of Couzens, sent B&K notice confirming the fact that the agreement would terminate on November 1, 1981. On November 4, 1981, Jack Weber, as agent for B&K, submitted to Rentar a list of 39 prospects who had been procured during the listing agreement period and who continued to maintain an interest in the property. The prospect list included General Motors Corporation (GM), the eventual lessee.

During November 1981, B&K expended substantial effort developing GM's interest in the property. This effort, which was accomplished with defendants' knowledge and encouragement, included showing the property, introducing GM's representatives to defendants' personnel, and obtaining plans of the warehouse for GM's inspection. As a consequence of these activities, GM indicated its willingness to begin negotiations for a lease of the property.

Lease negotiations were initiated in February of 1982. At the start of negotiations, GM asked if it could deal directly with defendants without B&K's assistance. B&K agreed to this request and, thus, participated minimally in the subsequent negotiations. Nevertheless, B&K maintained contact with all parties, and particularly with Ratner, throughout the negotiations. At a February 26, 1982, meeting, Ratner asked Weber if, when the lease was finalized, B&K would accept its commission in installment payments rather than as a lump sum. In a March 2, 1982, phone conversation, Weber agreed to this request.

A lease was proposed by GM in April of 1982 but was rejected by defendants. At an April 26, 1982, meeting during which the commission was discussed, Ratner told Weber that B&K would get "whatever commission it was entitled to *** if and when Rentar reached a deal with GM." On May 1, 1982, the 180-day extension of the listing agreement ended. On May 5, 1982, Weber met with Ratner and Dratt. Dratt questioned B&K's right to a commission given the termination of the extension period. Weber disputed this contention and on May 7, 1982, wrote Ratner restating this position. Throughout May, Weber attempted to get Ratner to clarify his position on the commission issue. Ratner declined to clarify but did promise to advise Weber concerning the issue after the lease was finalized. On May 27, 1982, a five-year lease with two five-year renewal options and a purchase option was finalized between GM and defendants. On June 19, 1982, Ratner informed Weber that no commissions would be paid to B&K.

On June 30, 1982, B&K filed a complaint against all defendants and against Ratner individually for a broker's commission in the sum

of $231,840 and for a declaration of B&K's rights in the event of either a renewal or an exercise of the purchase option. Defendants answered, denying both joint liability and Ratner's individual liability. On October 15, 1982, B&K moved for summary judgment. The trial court granted summary declaratory judgment that defendants had waived the termination date of the listing agreement and entered judgment in favor of plaintiffs and against defendants for $231,840 as plaintiff's brokerage commission. Subsequently, defendants' motion for reconsideration was denied and plaintiff's motion to amend the judgment to include prejudgment interest of $8,797.22 was allowed. Defendants then appealed.

OPINION

■■ Initially, defendants contend that B&K is not entitled to a commission since the lease was not finalized until after the termination of the 180-day extension period. Defendants argue that the express deadline of the listing agreement precludes B&K from recovering a commission on any transaction finalized after the agreement's termination. The trial court, however, found that defendants had waived the agreement deadline, thereby permitting recovery by B&K.

A broker is an agent contracted to act at the behest of a principal in a transaction involving some disposition of property. (*Hodgman, Inc. v. Feld* (1983), 113 Ill. App. 3d 423, 429, 447 N.E.2d 450; *Plastics & Equipment Sales Co. v. DeSoto, Inc.* (1980), 91 Ill. App. 3d 1011, 1015, 415 N.E.2d 492.) Generally, the employment agreement determines the broker's compensation for his actions on behalf of his principal. (*Dickerson Realtors, Inc. v. Frewert* (1974), 16 Ill. App. 3d 1060, 1063, 307 N.E.2d 445.) Further, if the term of the agreement is expressly limited, the broker will be entitled to a commission only if he fulfills his obligations within the stated term. (*Busch v. Eisin* (1981), 96 Ill. App. 3d 909, 913, 422 N.E.2d 135.) Thus, if a transaction must be finalized within a stated term as a condition for payment of the broker's commission, the broker can be deprived of the just fruits of his labor. *Arthur Rubloff & Co. v. Drovers National Bank* (1980), 80 Ill. App. 3d 867, 400 N.E.2d 614.

Illinois recognized this problem in *Frost v. Thompson* (1886), 18 Ill. App. 410, wherein the court reversed a decision denying recovery of a commission because the sale of property had been negotiated but not finalized within the agreement period. In *Frost,* the court ruled that the seller-principal had waived the express term of the agreement by continuing to urge the broker to find a purchaser as soon as possible. (18 Ill. App. 410, 412.) More recently, this court in *Dickerson*

*Realtors, Inc. v. Frewert* (1974), 16 Ill. App. 3d 1060, 307 N.E.2d 445, reached a similar conclusion when a principal-seller allowed a broker to continue to act as his agent after their agency agreement had expired. There the court found that the principal's actions operated to create an implied agreement on which the broker had relied. Furthermore, the court refused to permit the principal to benefit from the broker's effort while depriving him of his commission. 16 Ill. App. 3d 1060, 1063-64, 307 N.E.2d 445.

The present case, like *Frost* and *Dickerson*, involves a transaction negotiated with the broker's assistance during the term of the agreement but finalized after the term had run. Further, here, as in *Frost*, the court found that the principal's actions operated as a waiver of the agreement termination date. In addition, the trial judge, as in *Frost* and *Dickerson*, refused to strictly construe the agency agreement if such construction would preclude recovery of a rightfully earned commission.

Defendants, however, maintain that the present case is not supported by *Frost* and *Dickerson*. Defendants argue that the present situation is distinguishable from these cases because the agreement in question contains a 180-day extension clause. Defendants further complain that the trial court failed to rely on any cases which dealt with similar clauses.

Initially, defendants are incorrect in assuming that the extension clause created new or additional rights and obligations for the parties. As previously stated, the extension clause merely allowed B&K extra time to cultivate prospects procured during the original listing period. As such, the clause was not an extension of the entire exclusive listing agreement but rather a condition of the original employment contract. (*Van C. Argiris Co. v. Caine Steel Co.* (1974), 20 Ill. App. 3d 315, 319, 314 N.E.2d 361.) Thus, the extension clause generated no rights or duties not already present in the listing agreement itself.

 Secondly, defendants are incorrect in claiming that the trial court failed to rely on case law construing similar extension agreements. The court below relied on *Arthur Rubloff & Co. v. Comco Corp.* (1978), 63 Ill. App. 3d 362, 380 N.E.2d 15, wherein this court construed an extension clause in a listing agreement similar to that found in the present case. There the agreement contained a 90-day extension clause and required the broker procure a commercial lessee. A tenant was procured and negotiations were commenced during the term of the agreement. The lease, however, was not finalized until after the term had been completed. Nevertheless, the court ruled that the broker was entitled to his commission since the proposed lease

was submitted during the extension period and negotiations had been continuous up to the finalization of the lease *six months later*. In addition, the *Comco* court, like the *Frost* and *Dickerson* courts, recognized the inequity of allowing a principal to benefit from a broker's services without meeting the burden of payment of the broker's commission. (63 Ill. App. 3d 362, 368-70, 380 N.E.2d 15.) While strict construction of the listing agreement in the instant case would preclude B&K's recovery, *Comco*, together with *Frost* and *Dickerson*, indicates that a court may look beyond the formalities of a listing agreement to provide a fair and equitable result.

■ Defendants' second contention is that summary judgment was an improper method of determining the joint liability of all defendants and the individual liability of Ratner. They argue that the trial judge relied on facts from which conflicting inferences and conclusions could be drawn. Defendants maintain that these potential conflicts are disputed factual issues which preclude the use of summary judgment.

A motion for summary judgment is properly granted if the available evidence demonstrates that there is no material fact in issue and that the movant is entitled to judgment as a matter of law. Thus, the existence of almost any factual dispute between the parties will preclude use of the summary remedy. (Ill. Rev. Stat. 1983, ch. 110, par. 2—1005(c); *Bielarczyk v. Happy Press Lounge, Inc.* (1980), 91 Ill. App. 3d 577, 578-79, 414 N.E.2d 1161.) Summary judgment may also be improper if reasonable persons can draw conflicting inferences or conclusions from undisputed facts (*Nolan v. Johns-Manville Asbestos & Magnesia Materials Co.* (1979), 74 Ill. App. 3d 778, 794, 392 N.E.2d 1352; *Doran v. Pullman Standard Car Manufacturing Co.* (1977), 45 Ill. App. 3d 981, 986, 360 N.E.2d 440) or if the inferences sought to be drawn involve motive, intent, or subjective feelings (*Montgomery Ward & Co. v. Wetzel* (1981), 98 Ill. App. 3d 243, 247, 423 N.E.2d 1170). On the other hand, summary judgment is proper when the only disputed issue before the court is a matter of law. *Martin v. American Legion Post No. 784* (1978), 66 Ill. App. 3d 116, 118, 383 N.E.2d 672; *Baird & Warner, Inc. v. Stuparits* (1977), 53 Ill. App. 3d 338, 341, 368 N.E.2d 748.

Here, neither the briefs of the parties nor the trial record discloses any material dispute of fact. Arguably, the evidence presented could be susceptible of more than one interpretation, thereby precluding use of summary judgment. Here, however, such an argument is without merit. The court below ruled that defendants were jointly liable because their actions amounted to a waiver of the express term in the listing agreement. Determination of the waiver of a contract pro-

vision is an issue of law properly within the trial court's summary power. (*Business Development Services, Inc. v. Field Container Corp.* (1981), 96 Ill. App. 3d 834, 839, 422 N.E.2d 86.) In addition, the trial court determined Ratner's individual liability by construing his agency relation with the other defendants. Where, as here, evidence is not in dispute, agency is a matter of law, and consequently amenable to summary judgment. (*St. Ann's Home for the Aged v. Daniels* (1981), 95 Ill. App. 3d 576, 579, 420 N.E.2d 478.) Thus, defendants' contentions concerning ambiguity and conflicting inferences have no merit in these circumstances. Given this conclusion, we find that the trial court properly employed summary judgment.

For all the foregoing reasons we affirm the judgment of the circuit court.

Affirmed.

LORENZ and PINCHAM, JJ., concur.