BOARD OF DIRECTORS OF CARRIAGE WAY PROPERTY OWNERS ASSOCIATION, Plaintiff-Appellee, v. THE WESTERN NATIONAL BANK OF CICERO, Trustee, *et al.*, Defendants-Appellants.

First District (3rd Division)   No. 83—1813

Opinion filed December 18, 1985.

Burke, Griffin, Chomicz & Wienke, P.C., of Chicago (William T. Dwyer, Jr., of counsel), for appellants.

Steven J. Rosenberg, of Chicago, and Robert L. Levy, of Burr Ridge, for appellee.

JUSTICE McGILLICUDDY delivered the opinion of the court:

The plaintiff, Board of Directors of Carriage Way Property Owners Association, an Illinois not-for-profit corporation (the Association), filed a third amended complaint against the defendants, Western National Bank of Cicero, as trustee under trust No. 5920, Carriage Way Apartments, an Illinois general partnership and unknown owners. It alleged that the defendants owned the Carriage Way Apartments (the Apartments) in Burr Ridge and that the Association assessed common expenses and late charges against the Apartments from 1978 through 1981 which were not paid. Following trial, the court ordered the defendants to pay the assessments. The defendants appeal. The issues presented for review are: (1) whether the Carriage Way Property Owners Association declaration constituted a binding agreement between the parties which precluded quasi-contractual relief; (2) whether the trial court erred in finding an implied contractual obligation between the parties; (3) whether the trial court erred in finding the defendants were estopped from asserting a defense to the quasi-contractual claim and (4) whether the trial court erred in ruling that the defendants must pay all future assessments and that the obligation shall run with the land.

The third amended complaint set forth the following allegations: Carriage Way was a residential development of single-family homes and a three-building apartment complex. In 1964, the developer prepared and recorded the Carriage Way Property Owners Association declaration (Carriage Way declaration). In 1966, the Association established an operating budget on which assessments to the owners of the homes and the Apartments were based. The assessments were made separately for sewer maintenance and for a general fund. From 1966 through 1971, the owners of the Apartments fully paid the annual assessments for sewer maintenance and the general fund. In 1971, the village of Burr Ridge commenced maintenance of the sewers at Carriage Way. From 1972 through 1977, the owners of the Apartments fully paid the annual assessments for the general fund.[1] In 1978, the defendants informed the Association that they would not pay the 1978 assessment. The defendants failed to pay the assessments for 1979, 1980 and 1981. Count I sought foreclosure, attorney fees and judicial sale.

Count II adopted the allegations of count I and further alleged that the Association provided general maintenance, including land-

---

[1]The defendants purchased the Apartments in December 1975 and paid the 1976 and 1977 assessments.

scaping, lighting and preservation of a lake, thus conferring upon the defendants a substantial benefit and unjust enrichment. Count II sought damages and an order requiring the defendants to pay reasonable assessments for general maintenance as long as they owned the property.

Attached to the complaint was a copy of the Carriage Way declaration. It was recorded in April 1964 against both the single-family lots and the property occupied by the Apartments. The Carriage Way declaration authorized the Association to assess and collect dues for sewer maintenance.

At trial, Larry Whitlow testified that he had been on the board of directors and/or an officer of the Association for seven or eight years. The Association maintained the common areas of the Carriage Way development, which consisted of approximately 80 houses and 132 apartments. From photographs, Whitlow identified as common areas the main entrance to Carriage Way, a strip of land with grass and trees running the length of the Apartments, a lake, a field between the Apartments and the lake, a picnic and fishing area and a cul-de-sac. He testified that since the Apartments stopped paying assessments, the Association has been unable to repair a fence or plant trees.

Harmon Anderson, the director of construction for the Carriage Way development, testified that the maintenance of the common areas in the development contributed to the "curb appeal" of the Apartments. The only common element in front of the Apartments was a 900- by 10- or 12-foot strip of grass and trees. Residents of the Apartments used the field between the Apartments and the lake to walk, jog and picnic.

Thomas Holcer, a real estate appraiser, testified that maintenance of the common areas positively affected the value of the Apartments.

Dwayne Forst, the owner of a Carriage Way house, testified that he was the Association treasurer in 1978 and 1979. He billed the defendants for the general fund in each of those years. The bills were not paid. Forst identified a letter he received from the manager of the Apartments dated May 12, 1978. The letter announced that the 1978 assessment would not be paid because of the rising cost of maintaining the complex and because of the cost of putting a new roof on one of the buildings.

John E. Cernak, a real estate developer, testified that he built a home in the Carriage Way development in 1970. He lived in the house for seven years and in the Apartments for two years. The Association sponsored golf outings, pancake days, fairs, Christmas parties and so-

cial dances for residents of both the houses and the Apartments.

At the close of the plaintiff's case, the defendants moved for a directed verdict. The trial court granted the motion only as to count I.

James Avgeris testified for the defense that he was one of the general partners in the defendant partnership. The partnership bought the Apartments in December 1975, at which time it was not disclosed that the Association levied assessments for maintenance of the common areas. In 1976 and 1977, the Apartments were assessed for the Association's general fund. The bills were paid because past assessments had been paid by the previous owners of the Apartments, and the defendants assumed the assessments were justified. In 1978, Avgeris was advised by legal counsel that the Apartments were under no obligation to pay the assessment. In 1978, 1979 and 1980, Avgeris received bills from the Association and informed it that the Apartments were not obligated to pay. Avgeris testified that maintenance of the common areas had not increased the value of the Apartments. Although the Apartments occupied less than 10% of the 70-acre development, the Association had billed the Apartments for approximately 29.2% of its total maintenance cost. On cross-examination, Avgeris stated that when he examined the operating figures in the course of purchasing the Apartments, he could have seen the amounts spent by the prior owners for common maintenance of the property.

Lou Rathje, an attorney, testified that he was one of the general partners in the defendants partnership. Prior to the purchase, he was not aware that owners of the Apartments paid common maintenance assessments. He did not believe that maintenance of the common areas had any effect on the value of the Apartments. After examining the Carriage Way declaration, he assumed the Association had the power to assess only for sewer and storm water. Nothing of record disclosed assessment for common maintenance.

On June 29, 1983, the trial court concluded that the defendants' payment of Association general fund assessments for 1976 and 1977 were acts of acquiescence which operated as a waiver of any rights they may have had to object to their continuing obligation to pay. Moreover, stated the court, the plaintiff in good faith relied on such conduct in maintaining the common areas; thus, the defendants should be estopped from asserting that they had no legal obligation to continue contributing to the general fund. As a result of the conduct and relationship of the parties, the court found an implied contractual obligation between them. Accordingly, the trial court ordered that the defendants pay all general maintenance assessments which were billed and unpaid, and all general assessments billed by the plaintiff. The ob-

ligation was to run with the land. The defendants appeal.

■■ The defendants maintain that the Carriage Way declaration constituted a binding agreement between the parties which precluded quasi-contractual relief. The general rule is that no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests. (*Industrial Lift Truck Service Corp. v. Mitsubishi International Corp.* (1982), 104 Ill. App. 3d 357, 432 N.E.2d 999.) The Carriage Way declaration did not address assessment for the general fund or maintenance of common areas. Therefore, it did not constitute a contract concerning the same subject matter on which a quasi-contractual claim rested. A claim for quasi-contractual relief was thus not precluded.

The defendants contend that the trial court erred in finding an implied contractual obligation between the parties. It is not clear from the order whether the trial court considered the obligation to be based in implied contract or quasi-contract. In *Pope v. Speiser* (1955), 7 Ill. 2d 231, 130 N.E.2d 507, our supreme court set forth the generally accepted rule of implied contract:

> "There is an implication of a promise to pay for valuable services rendered with the knowledge and approval of the recipient in the absence of a showing to the contrary. A promise to pay the reasonable value of the service is implied where one performs for another, with the other's knowledge, a useful service of a character that is usually charged for, and the latter expresses no dissent or avails himself of the service. A promise to pay for services can, however, only be implied when they are rendered in such circumstances as authorized the party performing to entertain a reasonable expectation of their payment by the party benefitted." *Pope v. Speiser* (1955), 7 Ill. 2d 231, 237-38, citing 12 Am. Jur. *Contracts* sec. 5, at 501 (1938).

■■ In the case at bar, in 1978 and years following, the defendants informed the plaintiff that they would not pay the assessment. The defendants' refusal to pay was a clear expression of dissent which could not have led the plaintiff to entertain a reasonable expectation of payment. Under these circumstances, the law does not imply a promise to pay.

■■ While in an implied contract the existence of the agreement between the parties is determined by a consideration of their acts and conduct, in quasi-contract, the obligation arises not from an agreement but from some relation between the parties or from a voluntary act of one of them. (*Beatrice Foods Co. v. Gallagher* (1964), 47 Ill.

App. 2d 9, 197 N.E.2d 274.) The action is maintainable wherever one party has benefited from the services of another under circumstances in which, according to the dictates of equity and good conscience, he ought not to retain such benefit. (See *Rutledge v. Housing Authority of the City of East St. Louis* (1980), 88 Ill. App. 3d 1064, 411 N.E.2d 82.) In *Rutledge*, the court noted:

> "*** [I]t is important to consider the context in which particular services are rendered in determining whether any benefit accruing to the [recipient] would be unjustifiably retained absent the intercession of equitable principles. It is *unjust* enrichment which is to be avoided. (***; Restatement of Restitution sec. 1, comment *c* (1937).) The restatement articulates this fundamental aspect of the doctrine:
>
> > '*c. Unjust retention of benefit.* Even where a person has received a benefit from another, he is liable to pay therefor only if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for him to retain it. The mere fact that a person benefits another is not of itself sufficient to require the other to make restitution therefor.'" 88 Ill. App. 3d 1064, 1069.

■ In the present case, the defendants may have received a benefit from the maintenance of the common areas. This is not of itself sufficient, however, to require the defendants to pay for the maintenance. They informed the plaintiff that they were not legally required to pay and that they would not pay. That the plaintiff chose to continue to maintain the common areas does not render the defendants unjustly enriched. The defendants are under no quasi-contractual obligation to pay the assessments.

■ Included in the record was a declaration of protective covenants (the homeowner declaration), which was recorded in June 1964 against *only* the single-family lots. It authorized the Association to maintain trees, shrubbery, fences, walks, "etc.," costs to be paid out of the Association's general fund. Following the defendants' refusal to pay assessments, the costs of the continued maintenance of the common areas were presumably paid out of the general fund under the homeowner declaration. Any benefit incidentally realized by the defendants through the continued maintenance was not a sufficient basis for implied or quasi-contract. (See *Daley v. G'Sell* (1981), 102 Ill. App. 3d 548, 430 N.E.2d 556.) Other jurisdictions have held that where services are performed for the mutual benefit of all parties concerned, the law will not imply a promise to reimburse. (*Kuykendall v. Biggs* (Tex. Civ. App. 1959), 331 S.W.2d 67; *Williams v. Adams*

(1937), 250 App. Div. 603, 295 N.Y.S. 86.) The trial court erred in finding an implied contractual obligation between the parties.

■■ The defendants also argue that the trial court erred in finding they were estopped from asserting a defense to the quasi-contractual claim. Equitable estoppel is defined as the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in chancery, from asserting rights which might otherwise have existed as against another person who has, in good faith, relied upon such conduct and has been led thereby to change his position for the worse. (*Northern Trust Co. v. Oxford Speaker Co.* (1982), 109 Ill. App. 3d 433, 440 N.E.2d 968.) To be estopped, a party must engage in conduct which reasonably causes the other person to change his position by lulling the claimant into a false sense of security. (*Phillips Products Co. v. Industrial Com.* (1983), 94 Ill. 2d 200, 446 N.E.2d 234.) Here, the plaintiff maintained the common areas, presumably pursuant to the homeowner declaration, both before the defendants acquired ownership of the Apartments and after their refusal to pay the assessments. There is no indication that the defendants' payments in 1976 and 1977 lulled the plaintiff into a false sense of security or caused the plaintiff to change its position for the worse. The theory of equitable estoppel, therefore, is inapplicable to the present situation.

■■ The plaintiff argues that the defendants' payment of the general fund assessments for 1976 and 1977 were acts of acquiescence which operated to waive any rights to object to their continuing obligation to pay. Waiver presupposes that the party intends to forego a known right; there must be both knowledge that the right exists and an intent to relinquish it. (*Spray v. Illinois Civil Service Com.* (1983), 114 Ill. App. 3d 569, 449 N.E.2d 176.) The record in the case at bar indicates the defendants had no knowledge of their legal right to refuse to pay the assessments until 1978. Payment of the 1976 and 1977 assessments, therefore, did not display an intent to relinquish that right. The payments therefore did not constitute acts of acquiescence which operated to waive the defendants' right to object to a continuing obligation to pay.

In light of our decision, it is unnecessary to address the remaining issues.

For the foregoing reasons the order of the circuit court of Cook County is reversed.

Reversed.

WHITE, P.J., and McNAMARA, J., concur.