ROMANEK-GOLUB & COMPANY *et al.*, Plaintiffs-Appellees and Cross-Appellants, v. ANVAN HOTEL CORPORATION *et al.*, Defendants-Appellants and Cross-Appellees.

First District (5th Division) No. 87—1704

Opinion filed April 15, 1988.—Rehearing denied May 13, 1988.

Maurice J. McCarthy, of Chicago, for appellants.

Howard C. Emmerman and Jonathan D. Sherman, both of Rudnick & Wolfe, of Chicago, for appellees.

JUSTICE SULLIVAN delivered the opinion of the court:

Plaintiffs, Romanek-Golub & Company and E. Barry Mansur, brought an action against defendants, Anvan Hotel Corporation, Regency Partners and Anthony A. Antoniou, seeking compensation for services they provided in procuring an investor in the Barclay Chicago hotel. In count I of their amended complaint, plaintiffs sought recovery of $300,000 on the basis of a 10% real estate broker's commission in a "Letter Agreement" dated October 23, 1978. In count II, plaintiffs sought recovery of the same amount on a theory of *quantum meruit*. Shortly after plaintiffs rested their case, the trial court directed a verdict in favor of defendants as to count I (express contract) and the trial continued as to count II (*quantum meruit*). The jury returned a verdict in favor of plaintiffs in the amount of $150,000 on count II. Judgment was entered on the verdict.

Defendants appeal, contending that they were prejudiced by the admission into evidence of the "Letter Agreement," that plaintiffs did not sustain their burden of proof on count II (*quantum meruit*), that the jury was not properly instructed and that the court erred in awarding certain costs. Plaintiffs cross-appeal, contending that the court erred in directing a verdict in defendants' favor on count I (express contract).

On May 31, 1978, Quad Buildings, an Illinois limited partnership which was developing an office building complex in Lombard, Illinois (the St. Regis Center), engaged Romanek-Golub & Company, a licensed real estate broker, to locate investors for a 75% equity interest in the partnership for a total cash consideration of $2,325,000. Under the terms of their exclusive brokerage agreement, Quad Buildings agreed to pay Romanek-Golub a broker's commission of 10% of the consideration contributed to the limited partnership by investors who were obtained through Romanek-Golub's efforts. The agreement was signed by Anthony A. Antoniou, Quad Buildings' general partner, and E. Barry Mansur, vice-president of Romanek-Golub's investment brokerage division. Antoniou was a prominent real estate devel-

oper and an experienced hotel owner and operator; Mansur was a licensed real estate broker in Illinois.

Paragraph 9 of the agreement provided that a broker's commission of "not less than five per cent" of the total cash investment would be paid to Romanek-Golub in the event one of the purchasers of an equity interest in Quad Buildings invested in any other development on an adjoining 50-acre parcel of land in which Antoniou had an interest. Antoniou signed individually as to paragraph 9. No broker's commissions were earned under this provision.

Romanek-Golub procured an investor, Werner Hans, a Swiss citizen, who acquired the equity interest in the limited partnership, and Romanek-Golub was paid its 10% commission pursuant to the exclusive brokerage agreement. Hans had been a valued client of Romanek-Golub since 1977.

Toward the end of the negotiations regarding the St. Regis Center, after substantial work had been done at the construction site, Antoniou asked Mansur to arrange a meeting with Hans, who was being represented by a Chicago attorney, so that he could personally evaluate his future business partner. Antoniou told Mansur, "[I]f the deal is made, I have to meet Mr. Hans before it's signed." Antoniou admitted at trial that he also wanted to meet Hans because he knew that Hans might make substantial investments in other properties in which he had an interest.

An agreement in principle for Hans to purchase the 75% equity interest in the Quad Buildings limited partnership was reached on October 20, 1978. On October 24, 1978, Mansur, as a condition of introducing Antoniou to Hans, asked Antoniou to sign an agreement to compensate Romanek-Golub if its client, Hans, made any other investments in real estate owned by Antoniou. The proposed agreement, which was set forth in a letter from Mansur to Antoniou dated October 23, 1978, provided:

> "It is hereby agreed that in the event Mr. Werner Hans of Zurich, Switzerland, or any related or affiliated entities acquires all or a partial interest in real estate owned by Anthony A. Antoniou, or related or affiliated entities, there will be a fee of 10% of the money invested due and payable to Romanek-Golub and Company in cash at the time of funding of said monies."

Although Antoniou testified that he did not like the "Letter Agreement" presented to him on October 24, 1978, he admitted that he signed it voluntarily. He also acknowledged that Mansur never threatened to block Hans' investment in the St. Regis Center if he

refused to sign. Antoniou then traveled to Europe and met Hans.

Several months after the "Letter Agreement" was executed, Antoniou asked Romanek-Golub to present other investment opportunities to Hans, including the Knickerbocker hotel and the Regency-Orleans apartment building (later converted to the Barclay Chicago hotel) which Antoniou was seeking to purchase. Hans was "very interested" in the properties but he wanted to know whether he could acquire an interest in the Knickerbocker alone. Mansur asked Antoniou if he would be willing to split the two transactions, but Antoniou insisted that the two properties be offered as a package because the hotels would share the same management staff and some of the same equipment and it would be impossible to allocate expenses between them fairly. On August 10, 1979, Mansur sent a telex to Hans explaining Antoniou's requirement of one investor for both hotels.

In a letter dated September 10, 1979, Antoniou, on behalf of Anvan Hotel Corporation (Anvan), authorized Romanek-Golub to prepare a submission to Hans for a 50% equity interest in a limited partnership that had been formed to acquire both hotels. The letter reflected the parties' agreement that Romanek-Golub would receive a broker's commission of 10% of the funds invested in the partnership. Although Antoniou denied that Romanek-Golub was entitled to a broker's commission under the "Letter Agreement" of October 23, 1978, he admitted that he agreed to pay Romanek-Golub 10% of any monies Hans invested in the hotel partnership.

Romanek-Golub's staff analyzed the information supplied by Anvan and spent six to eight weeks preparing its own financial projections. To assist with its analysis, Romanek-Golub had the partnership proposal reviewed by an internal consultant, the former chief operating officer of the Four Seasons hotel chain, as well as outside consultants recommended by Anvan.

Between August and November 1979, Mansur communicated extensively with Hans regarding his possible investment in the Knickerbocker and Barclay limited partnership. On October 12, 1979, Mansur sent a six-page letter to Hans describing the financial structuring of the two hotels, economic projections for the first five years of Hans' proposed participation, renovations planned for the physical structure of the two buildings, and marketing strategies for the two properties under the proposed new ownership. Mansur's letter was accompanied by a 35-page report prepared by Romanek-Golub and submitted to Hans for his consideration in connection with the hotel purchases.

On November 26, 1979, Hans sent Mansur a telex stating that because of the uncertain American economic and political situation,

he was not willing to invest in any more real estate in the United States until a new president was elected. Mansur immediately informed Antoniou of Hans' refusal to pursue further negotiations and, some time later, Antoniou asked him to locate other investors in the hotel properties. Mansur ultimately identified several other potential investors, including Hotel Investors, a real estate investment trust with which Mansur and Antoniou had extensive negotiations, but no final agreements were reached with any of them.

Antoniou testified that after Mansur related the substance of Hans' telex message, he decided to give Hans the opportunity to invest in the Knickerbocker alone because he had expressed more interest in that hotel than in the Barclay. Accordingly, Antoniou asked Mansur to offer the Knickerbocker to Hans and called him several times to ascertain Hans' intent. In mid-December 1979, Mansur telephoned Antoniou and told him that Hans was not interested. Mansur, however, denied that Antoniou had authorized him to present the Knickerbocker alone to Hans, and Antoniou offered no documentary evidence contradicting Mansur's denial.

Antoniou testified further that Hans visited him at his office in the St. Regis Center in Lombard, Illinois, on Tuesday, February 19, 1980. After a brief conversation, Hans became angry and was very upset. He made two telephone calls, then left. Antoniou called Romanek-Golub and arranged a meeting with Jordan Glazov, Romanek-Golub's senior vice-president in charge of its investment brokerage and leasing division, at King Arthur's Pub on Thursday, February 21, 1980. Glazov was Mansur's supervisor.

Antoniou and Glazov gave conflicting versions of their conversation at King Arthur's Pub. Antoniou testified that he told Glazov that Hans became very upset when he discovered that Mansur had not offered him the opportunity to invest in the Knickerbocker separately from the Barclay. Glazov, however, stated that he expressed surprise at Hans' reaction because Antoniou had specifically instructed Romanek-Golub to present the two hotels as a package deal to Hans and, to Glazov's knowledge, Antoniou had never authorized Romanek-Golub to present either hotel separately to Hans. Glazov admitted on cross-examination, however, that on January 15, 1980, Mansur submitted an investment report on the Knickerbocker alone to another potential investor.

Both witnesses agreed that Antoniou insisted on dealing directly with Hans. Glazov stated that he yielded on this point with the understanding that Romanek-Golub would be paid a commission of 10% on any future investments by Hans per the "Letter Agreement" of

October 23, 1978. Antoniou admitted that he agreed to pay a broker's commission of 10%, but he denied that it was pursuant to the "Letter Agreement," which he regarded as "null and void." Antoniou and Glazov subsequently exchanged letters in which each summarized his understanding of their conversation.

Mansur testified that immediately after Hans' visit to the St. Regis Center in February 1980, Antoniou told him that Hans was very interested in investing in the Knickerbocker. In light of the telex he had received from Hans in late November 1979, Mansur was shocked but very pleased. Antoniou then asked Mansur that he be allowed to negotiate directly with Hans because he was confident that he could complete the transaction successfully. Antoniou assured Mansur that Romanek-Golub would be paid its 10% brokerage fee on any monies invested by Hans in the Knickerbocker.

Romanek-Golub honored Antoniou's request and did not intrude into his negotiations with Hans. Antoniou, for his part, kept Romanek-Golub informed of his discussions with Hans. In the spring of 1980, Hans invested $4,500,000 in the Knickerbocker and Antoniou paid Romanek-Golub a commission of $450,000, which represented 10% of Hans' investment in the limited partnership.

Mansur testified that after Hans acquired his equity interest in the Knickerbocker, Antoniou asked Romanek-Golub for permission to negotiate directly with Hans regarding the Barclay. Mansur agreed, after being assured that Romanek-Golub would be paid 10% of Hans' investment. Antoniou, however, denied this testimony.

According to Antoniou, in the course of the Barclay hotel negotiations conducted in July 1980, Hans insisted that the $300,000 broker's commission factored into the cost not be paid and that the price be reduced by that amount. Antoniou agreed and said that the commission would not be paid. To accommodate Hans' other financial commitments, the Barclay transaction was restructured from a cash purchase to a letter of credit posting.

Mansur testified that he had an "extremely cordial" meeting with Hans in Zurich in September 1980, in which he continued to promote the Barclay deal which, according to Antoniou, already had been consummated. Mansur submitted a nonexclusive brokerage agreement to Antoniou regarding the Barclay which was never signed. Antoniou, however, continually assured Mansur that Romanek-Golub would receive its 10% broker's commission on any investment Hans made in the Barclay.

Ultimately, Hans invested $3 million to purchase a 50% equity interest in the Barclay limited partnership (Regency Partners). Anto-

niou was one of the general partners. Mansur testified that shortly before the closing, Antoniou told him that he would not pay Romanek-Golub its broker's fee of $300,000 unless Romanek-Golub agreed to waive all of its future rights under the October 23, 1978, "Letter Agreement" to commissions earned on investments made by Hans in property in which Antoniou had an interest. Mansur refused to accede to this demand because it did not represent Romanek-Golub's agreement with Antoniou. Although Antoniou denied this testimony, he expressed the opinion that Romanek-Golub had "benefitted enough" from its commission on the Knickerbocker transaction and was entitled to no further compensation.

Mansur testified that based on his knowledge, education and experience in the real estate business, he was familiar with the usual and customary compensation for commercial real estate brokers in the Chicago area in 1979 and 1980. The standard broker's fee at the time was 10% of the equity raised which, in Mansur's opinion, represented the reasonable value of the services Romanek-Golub performed for defendants in procuring Hans' investment in the Barclay hotel limited partnership.

The trial court, as we have previously noted, directed a verdict in favor of defendants as to count I (express contract), which was based on the "Letter Agreement" of October 23, 1978. The jury awarded plaintiffs $150,000 in damages under count II (*quantum meruit*). In answer to a special interrogatory tendered by defendants, the jury found that defendants were not the procuring cause of Werner Hans' investment in the Barclay Chicago hotel.

OPINION

I

Defendants initially contend that the trial court erred in admitting the "Letter Agreement" into evidence. We believe that this issue has been waived.

Prior to trial, defendants filed a motion *in limine* asking the court to bar all references to the "Letter Agreement" of October 23, 1978, principally on the ground that the agreement was a "written listing contract," as that term is used in the Real Estate License Act of 1983 (Ill. Rev. Stat. 1985, ch. 111, par. 5801 *et seq.*), and was void for lack of an automatic expiration date, as required by the Act (Ill. Rev. Stat. 1985, ch. 111, par. 5819). The court denied the motion, and the "Letter Agreement" was admitted into evidence without objection. When plaintiffs asked leave of court to publish copies of the

agreement to the jury, defense counsel stated, "I don't mind that the jury sees it."

■■ Generally, an objection to the admission of evidence must be made when the evidence is offered. (*People v. Trefonas* (1956), 9 Ill. 2d 92, 98, 136 N.E.2d 817.) Here, counsel not only failed to object when the "Letter Agreement" was offered into evidence, but he expressly acquiesced in its publication to the jury. Under these circumstances, defendants have not preserved the error of which they have complained on appeal. Moreover, we do not believe that the requirement of a contemporaneous objection was obviated by the denial of defendants' pretrial motion *in limine*.

■■ A motion *in limine* merely presents an issue of admissibility of evidence which is likely to arise at trial in a pretrial setting. As such, the order, like any other interlocutory order, remains subject to reconsideration by the court throughout the trial. (*Beasley v. Huffman Manufacturing Co.* (1981), 97 Ill. App. 3d 1, 5, 422 N.E.2d 241.) "When a motion *in limine* is made, the trial judge must exercise his discretion in granting the motion or in denying it, thereby leaving to the unsuccessful movant the procedure of specially objecting to the evidence when it is offered at trial." *People v. McClain* (1978), 60 Ill. App. 3d 320, 324, 376 N.E.2d 774, citing *Department of Public Works & Buildings v. Roehrig* (1976), 45 Ill. App. 3d 189, 195, 359 N.E.2d 752.

This procedure would not have required counsel to object in front of the jury each time reference was made to the "Letter Agreement" at trial. Rather, counsel could have objected once, outside the presence of the jury, and asked for a continuing objection. (See *Beasley v. Huffman Manufacturing Co.* (1981), 97 Ill. App. 3d 1, 6, 422 N.E.2d 241.) No such objection was made in the case at bar.

■■ We note further that defendants never moved to strike the testimony relating to the "Letter Agreement," even after the court directed a verdict in their favor as to the count that was based on that agreement. And it was defendants, not plaintiffs, who thereafter first referred to the "Letter Agreement" during the direct examination of Anthony Antoniou. A party cannot complain of evidence which he himself has introduced or brought out. (*People v. Tribett* (1977), 54 Ill. App. 3d 777, 781, 370 N.E.2d 115.) Once defendants elicited testimony from Antoniou regarding the "Letter Agreement," plaintiffs were entitled to refer to that agreement in rebuttal.

We observe in this context that it may have been part of defendants' trial strategy not to object to the admission of the "Letter Agreement" after their motion *in limine* was denied because of their

theory that plaintiffs breached a fiduciary duty of loyalty to Antoniou in demanding that he sign the agreement as a condition of meeting Werner Hans.

An examination of the record refutes defendants' claim that plaintiffs were "permitted \*\*\* to recover indirectly on the void contract," *i.e.*, the "Letter Agreement" of October 23, 1978. The trial court directed a verdict in favor of defendants as to the count alleging breach of an express contract, and prior to closing argument the court specifically instructed the jury that the "Letter Agreement" was "void and unenforceable as a matter of law." The verdict on the *quantum meruit* count was one half of what it would have been had the jury awarded damages on the basis of the "Letter Agreement" and, as we discuss below, there was sufficient evidence of the reasonable value of plaintiffs' services, entirely apart from the 10% broker's commission mentioned in the "Letter Agreement" of October 23, 1978, to support the jury's verdict.[1]

## II

Defendants next contend that plaintiffs did not sustain their burden of proof on count II (*quantum meruit*). We disagree.

In law, "*quantum meruit*" means literally "as much as he deserves," and is an expression that describes the extent of liability on a contract implied by law and is predicated on the reasonable value of services performed. (*Edens View Realty & Investment, Inc. v. Heritage Enterprises, Inc.* (1980), 87 Ill. App. 3d 480, 486, 408 N.E.2d 1069.) The basis for recovery under this theory is receipt by a defendant from a plaintiff of a benefit which is unjust for him to retain without paying for it. 87 Ill. App. 3d at 486.

Defendants argue that they "discharged" plaintiffs as their real estate brokers on February 19, 1980, before they had obtained a ready, willing and able buyer who could purchase the hotel property on the seller's terms, and that any services performed by plaintiffs after that date were volunteered and not compensable under a *quantum meruit* theory of recovery. See *Board of Directors of Carriage Way Property Owners Association v. Western National Bank* (1985), 139 Ill. App. 3d 542, 547-48, 487 N.E.2d 974.

---

[1]Parenthetically, we note that the commission fixed in a written listing contract may be considered as some evidence of the reasonable value of the broker's services in an action seeking *quantum meruit* recovery, even though the listing contract itself is void for lack of an automatic termination date. *Edens View Realty & Investment, Inc. v. Heritage Enterprises, Inc.* (1980), 87 Ill. App. 3d 480, 484-88, 408 N.E.2d 1069.

██ This argument, however, ignores contrary evidence that Antoniou specifically asked plaintiffs for permission to conclude the Knickerbocker and Barclay hotel negotiations directly with Hans, and that he repeatedly assured them that the broker's commission of 10% would be paid. The jury obviously chose to believe this evidence, and we cannot say that their resolution of this factual issue was in error.

Defendants also cite *Van C. Argiris & Co. v. FMC Corp.* (1986), 144 Ill. App. 3d 750, 494 N.E.2d 723, for the proposition that any services plaintiffs performed prior to February 19, 1980, were merely "preliminary." In our judgment, *Argiris* is clearly distinguishable.

In *Argiris*, the services rendered by the broker consisted of introducing the buyer and the seller, taking the buyer on a one-hour tour of the property and writing numerous follow-up letters in an unsuccessful effort to maintain the buyer's interest in the property. (144 Ill. App. 3d at 754.) These services were performed, according to the court, "without any reasonable anticipation on the part of either the plaintiff or the defendant that reimbursement [would] directly result." (144 Ill. App. 3d at 755.) In *Argiris*, the plaintiff broker was competing for an exclusive listing contract and had no reasonable expectation of payment.

In the case at bar, however, defendants asked plaintiffs to prepare numerous submissions to Hans and assured them that their fees would be paid. In *Argiris*, in answer to a special interrogatory, the jury identified a broker other than the plaintiff as the procuring cause of the subject transaction; here, in answer to a special interrogatory tendered by defendants, the jury found that defendants were *not* the procuring cause of Werner Hans' investment in the Barclay hotel.

██ Defendants next argue that plaintiffs failed to establish a *prima facie* case for *quantum meruit* recovery at trial.[2] A broker who is the procuring cause of a sale is entitled to a commission under the theory of *quantum meruit* where a party receives a benefit which is unjust for him to retain without paying for it. "A broker's right to commission depends on whether the sale was procured through his efforts or through information derived from him, and cannot be defeated if the owner makes a sale himself." *Edens View Realty & Investment, Inc. v. Heritage Enterprises, Inc.* (1980), 87 Ill.

---

[2]A real estate broker may recover the reasonable value of his services under the theory of *quantum meruit* even though the written listing contract is void for lack of an automatic termination date. *Edens View Realty & Investment, Inc. v. Heritage Enterprises, Inc.* (1980), 87 Ill. App. 3d 480, 484-88, 408 N.E.2d 1069.

App. 3d 480, 485, 408 N.E.2d 1069.

■ Here, there was substantial evidence from which the jury reasonably could have concluded that plaintiffs were the procuring cause of Werner Hans' investment in the Barclay hotel, a conclusion which is supported by the jury's answer to the special interrogatory. Plaintiffs could not be deprived of their commission merely because defendants asked for and received permission to complete the negotiations without the direct involvement of plaintiffs, who had brought the parties together. See *Bennett & Kahnweiler Associates v. Ratner* (1985), 133 Ill. App. 3d 316, 478 N.E.2d 1138; *Dickerson Realtors, Inc. v. Frewert* (1974), 16 Ill. App. 3d 1060, 307 N.E.2d 445.

■ Finally, we reject defendants' argument that plaintiffs failed to establish the reasonable value of their services to recover under *quantum meruit*. After being qualified as an expert in the real estate business, Barry Mansur testified that the standard broker's fee for commercial real estate brokers in the Chicago area in 1979 and 1980 was 10% of the equity raised, which, in Mansur's opinion, represented the reasonable value of the services Romanek-Golub performed for defendants in procuring Werner Hans' investment in the Barclay hotel partnership. Mansur's qualifications to render an expert opinion and his testimony regarding the value of Romanek-Golub's services went unchallenged by defendants who offered no contrary evidence.

■ Unlike cases involving attorney fees (see, *e.g., In re Estate of Murphy* (1978), 56 Ill. App. 3d 1037, 372 N.E.2d 878), *quantum meruit* recovery in real estate broker's commission cases may be based on a percentage of the sales price (see *Bennett & Kahnweiler Associates v. Ratner* (1985), 133 Ill. App. 3d 316, 478 N.E.2d 1138; *Edens View Realty & Investment, Inc. v. Heritage Enterprises, Inc.* (1980), 87 Ill. App. 3d 480, 408 N.E.2d 1069; *Dickerson Realtors, Inc. v. Frewert* (1974), 16 Ill. App. 3d 1060, 307 N.E.2d 445). The jury awarded plaintiffs $150,000, which represented 5% of Hans' investment in the Barclay hotel partnership. In light of the uncontradicted expert testimony that 10% of the equity investment would have been reasonable, we are unable to conclude that the verdict in favor of plaintiffs on their *quantum meruit* claim was excessive or against the manifest weight of the evidence.

III

Defendants also contend that the jury was not properly instructed. Defendants argue first that the trial court erred in refusing to instruct the jury on the principles of agency law and the responsi-

bilities of a fiduciary to his principal.

 Breach of a fiduciary duty is an affirmative defense which must be specifically pleaded. (Ill. Rev. Stat. 1985, ch. 110, par. 2—613(d); *Worner Agency, Inc. v. Doyle* (1985), 133 Ill. App. 3d 850, 859, 479 N.E.2d 468.) Since no such affirmative defense was pleaded here, defendants were not entitled to any instructions thereon. See *Mitchell v. Four States Machinery Co.* (1966), 74 Ill. App. 2d 59, 79, 220 N.E.2d 109.[3]

An examination of the trial record indicates that defendants attempted to raise the defense of breach of fiduciary duty, not to defeat plaintiffs' *quantum meruit* claim, but their express contract claim, which was based on the "Letter Agreement" of October 23, 1978. The trial court, however, directed a verdict in favor of defendants on the express contract count, and it is not at all apparent that the defense of breach of fiduciary duty, even if it had been properly pleaded, would have barred plaintiffs' recovery under *quantum meruit*. See *Kravis v. Smith Marine, Inc.* (1973), 15 Ill. App. 3d 494, 501-02, 304 N.E.2d 720, *rev'd on other grounds* (1975), 60 Ill. 2d 141, 324 N.E.2d 417 (breach of fiduciary responsibilities did not preclude attorney from *quantum meruit* recovery for the reasonable value of his services); see also *Durr v. Beatty* (1986), 142 Ill. App. 3d 443, 451-52, 491 N.E.2d 902 (*dictum*).

 Defendants next argue that the instruction on procuring cause was deficient. The instruction stated:

> "A broker is deemed to be the procuring cause of an investment transaction, if he was instrumental in bringing the parties together and if the investment transaction was thereafter made by the parties as a result thereof. Under such circumstances, the real estate broker is entitled to be paid even though other persons may have participated in the negotiations, and even though negotiations may have been conducted by the parties at which the broker was not present, and even though the investment transaction was made without the broker's being present or without his knowledge."

The instruction was approved in *Cole v. Brundage* (1976), 36 Ill. App. 3d 782, 805-06, 344 N.E.2d 583, and incorporated the elements of the refused instruction which defendants contend should have been

---

[3]Contrary to defendants' argument, the defense of breach of fiduciary duty was not raised in their motion for summary judgment filed two days before trial commenced. Although the motion claimed that the "Letter Agreement" of October 23, 1978, was a "contract of adhesion," the motion was silent regarding breach of fiduciary duty.

given in its place or in addition thereto.[4]

During deliberations the jury sent a note to the court asking whether the foregoing instruction would conform with the law if it read "*any* investment transaction" instead of "*the* investment transaction." (Emphasis added.) In response, the court directed the jury "to follow the instruction as worded in the instruction." Defendants contend that the court should have answered "no" to the jury's inquiry to ensure that plaintiffs were not awarded any damages for services unrelated to the Barclay hotel transaction. We find no error in the court's response.

The instructions given to the jury, particularly plaintiffs' proposed instruction No. 15, left no doubt that plaintiffs were entitled to *quantum meruit* recovery only if they proved that they were the procuring cause of Werner Hans' investment in the Barclay hotel. (This was also apparent from the closing arguments.) When the instructions are considered together, the phrase, "the investment transaction," as used in the procuring cause instruction, clearly refers to the Barclay transaction, and the court's direction to the jury "to follow the instruction as worded" simply reinforced that reference. We also observe that in a civil case, the court is not required to clarify an instruction which correctly states the applicable law. See *Kingston v. Turner* (1987), 115 Ill. 2d 445, 462-63, 505 N.E.2d 320.

Defendants argue further that the court improperly refused to submit two other instructions regarding rejection of a transaction and "preliminary services." Defendants, however, have offered no source for the former instruction, either below or on appeal, and the latter instruction, as worded, was unintelligible.

■■■ Finally, defendants argue that the court erred in refusing to submit two special interrogatories to the jury.

Special Interrogatory No. 1 asked:

"If you have rendered a verdict for the plaintiffs, have you restricted your award to the reasonable value of their services specifically with regard to investment in the Barclay Chicago Hotel Property?"

Special Interrogatory No. 2 asked:

"If you have rendered a verdict for the plaintiffs, does your award include any amounts which reflect services rendered

---

[4]The refused instruction stated:

"When I use the term 'procuring cause' I mean that in order to recover, the broker must prove that he was instrumental in bringing the buyer and the seller together and that the transaction at issue was made as a result of the broker's efforts."

with regard specifically to investment in any property other than the Barclay Chicago Hotel property?"

In our judgment, the court properly refused to submit these interrogatories. It has long been the rule that "[t]he court is not required to submit a special interrogatory unless it relates to ultimate facts of such a character that it would control a general verdict." (*Springfield Coal Mining Co. v. Gedutis* (1907), 227 Ill. 9, 13, 81 N.E. 9.) Consistent with this rule, the court, in *Stephenson v. Air Products & Chemicals, Inc.* (1969), 114 Ill. App. 2d 124, 252 N.E.2d 366, held that a special interrogatory tendered by the defendant was properly refused where a negative answer could have served only to reduce, not preclude, a verdict in favor of the plaintiff. 114 Ill. App. 2d at 137.

Here, a negative answer to the first interrogatory or an affirmative answer to the second would not have controlled the general verdict in favor of plaintiffs—it would have only reduced the amount of that verdict. Defendants tendered one proper special interrogatory (whether defendants were the procuring cause of Werner Hans' investment in the Barclay hotel), which was given, and the jury's negative answer was entirely consistent with their general verdict.

## IV

■■■ Finally, defendants contend that the trial court erred in awarding costs to plaintiffs under Supreme Court Rule 237(b) (107 Ill. 2d R. 237(b).) We disagree.

At the beginning of trial, defendants served plaintiffs with a notice to produce Eugene Golub, an officer of Romanek-Golub who was vacationing with his family in Colorado, as an adverse witness pursuant to Supreme Court Rule 237(b). Plaintiffs produced Golub in compliance with defendants' notice but, after the court directed a verdict in their favor as to count I (express contract), defendants informed plaintiffs that they would not call Golub as an adverse witness.

Plaintiffs subsequently filed a motion for costs, which was supported by the affidavit of Eugene Golub. After a hearing, the court awarded plaintiffs $994 as costs for producing Golub pursuant to defendants' notice.

Rule 237(b) provides in relevant part that "[i]f the party or person [whose appearance at trial is required by service of notice under the rule] is a nonresident of the county, the court may order any terms and conditions in connection with his appearance at the trial that are just, including payment of his reasonable expenses." 107 Ill. 2d R. 237(b).

Defendants contend that plaintiffs were not entitled to recover Golub's expenses in traveling between Colorado and Chicago because he is a resident of Cook County. We are unable to reach the merits of this contention, however, because defendants have not provided us with a transcript of the hearing on plaintiffs' motion for costs. In the absence of the transcript, we must assume that there was a factual basis for the court's award.

Plaintiffs have asked us to consider the merits of their cross-appeal on count I (express contract) only in the event we reversed the judgment entered in their favor on count II (*quantum meruit*). In light of our disposition of defendants' appeal, we need not reach the issues raised in the cross-appeal.

For the foregoing reasons the judgment of the circuit court of Cook County is affirmed.

Affirmed.

LORENZ, P.J., and PINCHAM, J., concur.